Spiros KOUTSOUBOS, Administrator of the Estate of James Koutsoubos

v.

BOEING VERTOL, DIVISION OF the BOEING COMPANY and the Boeing Company.

Civ. A. No. 81–1090.

United States District Court, E.D. Pennsylvania.

Dec. 22, 1982.

Nicholas P. Cardwell, Cardwell, Cardwell & Smoragiewicz, Hartford, Conn., for plaintiff.

F. Hastings Griffin, Jr., Dechert, Price & Rhoads, Philadelphia, Pa., for defendant.

## OPINION

LOUIS H. POLLAK, District Judge.

On the evening of March 21, 1979, James Koutsoubos was one of three Navy crewmen who, with two Navy pilots, were assigned to a helicopter training flight off the Florida coast. The training flight was a simulated rescue in which the helicopter was to find and then hover over a floating smoke flare guiding the rescuers to the putative accident victim. The helicopter made several approaches to the flare; on the fourth approach, the helicopter hit the water. It turned over and then floated upside down for several minutes. Koutsoubos and his two fellow crewmen were killed.

Plaintiff, Koutsoubos' father, brought this action under the Death on the High Seas Act, 46 U.S.C. §§ 761–768, to recover damages for his son's death. Defendants Boeing Vertol and the Boeing Company manufactured the helicopter and supplied it to the Navy pursuant to a contract between the Navy and the Boeing Company. Proceeding on a theory of strict liability, plaintiff alleges that the helicopter was defective: "unsafe, unairworthy and dangerously unfit for its intended use." Complaint ¶ 8(a).

Defendants have moved for summary judgment, relying on the "government contract defense," which, so defendants contend, shields government contractors from liability to third parties for design defects in products supplied to government specifications. Plaintiff, contending that the defense is inapplicable in a product liability setting, asks that the defense be stricken and that summary judgment be denied.

## I.

The Supreme Court first recognized the government contract defense in *Yearsley v. Ross Construction Co.,* 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940). In *Yearsley,* the Court ruled that the defendant, a company that performed work under a contract with the federal government, was not liable for injury to private property resulting from its work improving navigation of the Missouri river: "[I]f this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Id.* at 20–21, 60 S.Ct. at 414–415. Subsequently, state and federal courts have used the *Yearsley* rationale to shield government contractors from liability when they complied with government specifications.[1]

Plaintiff challenges the applicability of *Yearsley* and the government contract defense in this case. Because plaintiff's negligence claims, *see* 28 U.S.C. § 2680(a), and strict liability claims, *see Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972), against the government would be barred by sovereign immunity, he argues that "fundamental fairness" requires permitting him to assert those claims against defendant. The cases, however, explain

---

1. *See Myers v. United States,* 323 F.2d 580, 583 (9th Cir.1963); *Green v. ICI America, Inc.,* 362 F.Supp. 1263, 1266 (E.D.Tenn.1973); *Dolphin Gardens, Inc. v. United States,* 243 F.Supp. 824, 827 (D.Conn.1965); *Valley Forge Gardens v. Morrissey, Inc.,* 385 Pa. 477, 123 A.2d 888 (1956).

why this argument must be rejected. "First, tort liability principles properly seek to impose liability on the wrongdoer whose act or omission caused the injury, not on the otherwise innocent contractor whose only role in causing the injury was the proper performance of a plan supplied by the government.... Before any societal benefit can be derived from the deterrent effects of tort liability, however, the party in a position to correct the tortious act or omission must be held accountable for the damages caused and thus motivated to prevent future torts." *In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 762, 793–94 (E.D.N.Y.1980). Second, "[t]o impose liability on the contractor ... [when the government is immune from suit] would render the Government's immunity ... meaningless, for if the contractor was held liable, contract prices to the Government would be increased to cover the contractor's risk of loss from possible harmful effects of complying with decisions of executive officers authorized to make policy judgments." *Dolphin Gardens, Inc. v. United States,* 243 F.Supp. 824, 827 (D.Conn.1965).[2]

■ In an opinion recently handed down in the context of the "agent orange" product liability litigation now pending in the Eastern District of New York, Judge George C. Pratt has discussed the government contract defense and set forth the elements that a defendant must prove in order to prevail. *See In re "Agent Orange" Product Liability Litigation,* 534 F.Supp. 1046 (E.D.N.Y.1982). In essence, the defense shields a manufacturer from liability if the product causing the injury complied strictly with government contract specifica-

tions concerning design. Accordingly, Judge Pratt ruled that the suppliers of agent orange, who asserted the government contract defense in law suits initiated by Vietnam veterans and members of their families, would have to prove:

1. That the government established the specifications for "Agent Orange";

2. That the "Agent Orange" manufactured by the defendant met the government's specifications in all material respects; and

3. That the government knew as much as or more than the defendant about the hazards to people that accompanied use of "Agent Orange."

534 F.Supp. at 1055. The burden would be on a defendant to prove these three elements, in addition to establishing that it had one or more contracts with the government under which the particular product that caused the injury was supplied.

The first element would demand proof that the government established the design and specific characteristics of the product. If, however, the contract "set forth merely a 'performance specification,' as opposed to a specified product, then the government contract defense would be far more restricted...." *Id.* at 1056.

The second element would require comparison between the government's specifications and the characteristics of the product. If methods of manufacture were specified, they would be examined as well. "Failure of a defendant to conform to the specifications would defeat the defense only if the discrepancy between specifications and product was a material one...." *Id.* at 1057.

---

**2.** The cases chiefly relied on by plaintiff as rejecting the government contract defense are inapposite: *See Foster v. Day & Zimmerman, Inc.,* 502 F.2d 867, 874 & n. 5 (8th Cir.1974) (plaintiff's claim was "based on proof of the defendants furnishing a defective product"; the specifications of the government contract "did not call for the defendants to assemble a defectively made grenade"); *Whitaker v. Harvell-Kilgore Corporation,* 418 F.2d 1010, 1012–15 (5th Cir.1969) (government contract required defendant to carry liability insurance and provided that the government would indemnify it for any losses because of injuries or deaths);

*Merritt, Chapman & Scott Corp. v. Atkinson Co.,* 295 F.2d 14 (9th Cir.1961) (government contract defense does not protect a contractor when the contract leaves the details of construction and maintenance entirely in the contractor's hands and when none of the acts charged as negligent is required by the government contract). *See also Powell v. United States Cartridge Co.,* 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (1950) (employees of contractor operating a munitions plant owned by the United States not exempt as government employees from the minimum wage and maximum hour provisions of the Fair Labor Standards Act).

With respect to the third element, which he labelled a "central question" in the agent orange context, Judge Pratt said:

> A defendant can be insulated from liability by the government contract defense only if in addition to showing compliance with specifications established by the government, it can show that it was not aware of hazard-causing deficiencies in the specifications as to the design or method of manufacture, deficiencies which, if known to the government, might have altered the government's decisions. . . .

*Id.* If a defendant has knowledge of such deficiencies, but the government has equal or greater knowledge, the defendant can still be shielded from liability as long as the product was produced "pursuant to and in compliance with the contract specifications." *Id.*

## II.

 I am persuaded by the reasoning set forth by Judge Pratt in *In re "Agent Orange" Product Liability Litigation,* 534 F.Supp. 1046 (E.D.N.Y.1982), and the earlier opinions in that litigation,[3] that the government contract defense is viable and is applicable in this case. Accordingly, defendants here have the burden of proving the three elements of this affirmative defense as described by the court in *Agent Orange,* 534 F.Supp. at 1055.

First, therefore, defendants must show that the government established the specifications for the helicopter. "[A]ll that is necessary on this element of the defense is for defendant to prove that the product it supplied was a particular product specified by the government." 534 F.Supp. at 1056. An affidavit submitted by Robert Tingley, senior contract administrator for Boeing Vertol ("Affidavit"), and its supporting exhibits provide sufficient proof of this element of the defense. The contract between defendants and the Navy required defendants to furnish 85 Model CH–46A helicopters, including helicopter number 152510,

which crashed in March 1979 while carrying plaintiff's son. *See* Tingley Affidavit ¶ 3; Exhibits A, B, & C.

Second, defendants must show that the helicopter met the government's specifications in all material respects. This element of the defense calls for a comparison between the government's specifications for the helicopter with the characteristics and quality of the product supplied. Failure to conform to the specifications would defeat the defense only if the discrepancy is a material one. 534 F.Supp. at 1057.

"Material" specifications in the context of this action relate to those aspects of the helicopter's design alleged by plaintiff to be defective. Although plaintiff's complaint is framed in several counts, its heart is paragraph eight. In addition to the general allegation that the helicopter was "unsafe, unairworthy and unfit for its intended use," plaintiff in paragraph eight asserts several specific defects: inadequate inspection and testing; failure to warn of defective design; failure to design with an easy means of escape or egress for crew members in the event of a crash into water; and failure to design with adequate safety features.

The exhibits submitted in support of the Tingley Affidavit show a very long list of general and detailed specifications established by the contract for this helicopter. According to the Affidavit, the general and detail specifications were established by the Navy. In addition, the Affidavit declares that the Navy established safety features, testing requirements, emergency exit marking requirements, and interior lighting requirements. In short, "[e]very feature of the CH–46A, including its water landing and flotation capability and emergency egress and lighting, was tested and inspected to Navy requirements." Affidavit ¶ 11. Finally, "[o]n March 3, 1966, after satisfying itself that Boeing had furnished an aircraft which met all requirements of the Contract, the Navy accepted Helicopter 152510." *Id.* ¶ 12.

---

**3.** *See In re "Agent Orange" Product Liability Litigation,* 91 F.R.D. 618 (E.D.N.Y.1981); *In re*

*"Agent Orange" Product Liability Litigation,* 506 F.Supp. 762 (E.D.N.Y.1980).

A closer look at the specifications themselves shows that the Navy chose the "material" design features for this helicopter; that is, the Navy established the specifications crucial to plaintiff's allegations of defective design.[4] Inspection by the Navy revealed that these specifications had been satisfied.[5]

The complaint also alleges manufacturing defects and a failure to warn the decedent of the hazards associated with the helicopter; however, as defendants note in their brief, plaintiff's answers to interrogatories show that these additional allegations are merely repetitive of plaintiff's assertions concerning design defects.[6]

██ The third element of the defense, as set forth by the Court in *Agent Orange*, 534 F.Supp. at 1055, is that "the government knew as much as or more than the defendant about the hazards" of the product. Under this element of the defense it is appropriate to address plaintiff's argument that the government contract defense does not apply in a situation where the government consulted with the contractor in establishing the specifications for the product. As Judge Pratt noted in *Agent Orange,* however, evidence of defendant participation in preparation of the specifications could not defeat the government contract defense, although such evidence might be "relevant in establishing the relative degrees of knowledge as between the government and the defendants." 534 F.Supp. at 1056.[7]

██ In the submissions made thus far, defendants have not met their burden of proving that the government's knowledge about the hazards associated with the helicopter was equal to or greater than theirs. Accordingly, defendants must show that they were "not aware of hazard-causing deficiencies in the specifications as to the design or method of manufacture, deficiencies which, if known to the government, might have altered the government's decisions as to whether and how to use the [product]." 534 F.Supp. at 1057. If defendants are able to show at trial that the government knew as much as they did about the hazards associated with the design of the CH–46A, they will be protected from liability by the government contract defense.

---

4. First, the specifications concerning flotation and water landing capability show that the Navy chose a design permitting the helicopter to land on water in an emergency and to float for two hours "in sea state two conditions" with the doors and hatches closed. *See* Exhibit C ¶ 3.19.4.8; Exhibit B ¶ 3.9. Second, the contract specifically provides for six emergency exits, their locations, and the markings to identify them. Exhibit B ¶ 3.7.1.7; Exhibit C ¶ 3.7.1.7.1; Exhibit D; Exhibit E. Third, the contract specified interior lighting requirements. *See* Exhibit E. Fourth, the contract provided for testing and inspection by the Navy prior to its acceptance of the aircraft. It designates an inspector to "conduct physical inspection at the place of manufacture, perform tests and accept or reject the supplies or services being procured in accordance with the terms of this contract." Exhibit A, last page at ¶ I. The contract specified the tests and inspections to be performed. Exhibit A at 4, Items 2 & 3; *Id.* at 28, Section EE; *Id.* at 29, Section FF. As noted above, every feature of the CH–46A was inspected and tested to Navy requirements. Affidavit ¶ 11. The Navy accepted Helicopter 152510 on March 3, 1966. *Id.* at ¶ 12.

5. *See supra* note 4.

6. E.g., plaintiff stated that the manufacture of the helicopter "failed to incorporate design features to provide for" various safety features, *see* Plaintiff's Second Supplemental Answers to First Set of Interrogatories of defendants at 35(b), and that the danger of which defendants failed to warn was that the aircraft "had not been properly designed, manufactured, assembled and tested as per Answers No. 35 above." *Id.* at 36(b).

7. Plaintiff concedes that the Navy approved any suggestions defendants made and also approved the specifications written into the contract.