Janet A. HUBBS, Executrix of the Estate of David A. Hubbs, Deceased, et al.

v.

UNITED TECHNOLOGIES And Sikorsky Aircraft, Division of United Technologies.

Civ. A. No. 80–3972.

United States District Court, E.D. Pennsylvania.

Nov. 1, 1983.

---

E. Paul Maschmeyer, William M. Shields, Monteverde, Hemphill, Maschmeyer & Obert, Philadelphia, Pa., for plaintiffs.

J. Grant McCabe, III, William A. Zurzolo, John S. Bagby, Jr., Rawle & Henderson, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

This civil action arises from the crash of a Navy SH–30 helicopter near Willow Grove Naval Air Station on October 26, 1978. Representatives of the estates of three naval reservists killed in the crash brought this diversity action under the Pennsylvania wrongful death and survival statutes. Presently before the Court is defendants' motion for summary judgment.

All parties agree that the crash was caused by a malfunction in the cyclic pitch axis control system, which controls the pitch or tilt of the helicopter. Defendants contend that the crash was caused during in-flight training maneuvers "when an improperly installed bolt in the cyclic pitch axis control system became disengaged in flight." Plaintiffs contend, however, that the crash occurred when the cyclic pitch control "disengaged in flight because of a defective fastener." The fastener system in question is designed so that when the bolt is properly installed with its designated washer, castellated nut, and cotter pin, disengagement is allegedly impossible. The castellated nut and washer are placed on the end of the bolt and the cotter pin inserted through grooves in the nut and a hole in the bolt.

Defendants move for summary judgment based on what has commonly been termed the "government contractor defense." It is defendants' contention that they are immune from liability because the SH–30 helicopter was manufactured by Sikorsky Aircraft and supplied to the United States Navy in strict accordance with applicable Navy contractual specifications. Defendants further assert that they had no power to alter the Navy's design specifications. Although defendants specifically studied and discussed with the Navy some of the safer design features now urged by plaintiffs, the Navy specifically rejected such design changes.

Plaintiffs allege that the cotter pin in the fastener system on the SH–30 helicopter in question fractured, permitting the nut to work loose in flight as a result of vibration, allowing the bolt to come out and disconnect the flight controls. Plaintiffs assert that this important connection should have been secured by some type of system employing a double fastener such as a self-retaining bolt with a nut and cotter key, a lock nut and a cotter key, or a double bolt with a nut and cotter key, a lock nut and a cotter key, or a double lock nut and a

cotter key. Furthermore, plaintiffs argue that the flight control system should have been designed in such a way that the system would fail in mid-range, rather than allowing the helicopter to fall in an extreme nose-down position.

## A. THE GOVERNMENT CONTRACT DEFENSE

■ The government contract defense has been the subject of a substantial amount of recent case law. A comprehensive analysis of the defense as it would apply to the case at bar was set forth by the Ninth Circuit in *McKay v. Rockwell Intern. Corp.*, 704 F.2d 444, 448–50 (9th Cir.1983). In short, the government contract defense protects a government contractor from liability for acts done by him while complying with government specifications during execution of performance of a contract with the United States. The reasons for applying the government contractor defense to suppliers of military equipment with design defects approved by the government parallel those supporting the *Feres-Stencel* doctrine: [1]

(1.) [H]olding the supplier liable in government contractor cases without regard to the extent of government involvement in fixing the product's design and specifications would subvert the *Feres-Stencel* rule since military suppliers, despite the government's immunity, would pass the cost of accidents off to the United States....

(2.) [T]o hold military suppliers liable for defective designs where the United States set or approved the design specifications would thrust the judiciary into the making of military decisions....

(3.) Trials on design defects where government specifications are at issue would "involve second-guessing military orders...."

(4.) [I]n setting specifications for military equipment, the United States is re-

quired by the exigencies of our defense effort to push technology towards its limits and thereby incur risks beyond those that would be acceptable for ordinary consumer goods....

(5.) [A] government contractor defense provides incentives for suppliers of military equipment to work closely with and to consult the military authorities in the development and testing of equipment.

*Id.* at 449–50.

The government contract defense has been broken down into a three-element analysis which has been adopted by this Court in *Koutsoubos v. Boeing Vertol, Div. of Boeing Co.*, 553 F.Supp. 340 (E.D. Pa.1982). Applying the three-element test to the case at bar, the burden would be on defendant to establish the following three elements in order to succeed on the government contract defense at trial or in the context of a motion for summary judgment:

(1.) That the government established the specifications for the SH–30 helicopter;

(2.) That the SH–30 helicopter manufactured by the defendant met the government's specifications in all material respects; and

(3.) That the government knew as much as or more than the defendant about the hazards to people that accompanied the use of the SH–30 helicopter.

*See id.* at 342; *In re "Agent Orange" Product Liability Litigation*, 534 F.Supp. 1046, 1055 (E.D.N.Y.1982).

■ The Court must now ascertain whether on the basis of the record presently before the Court defendants have established each of the three elements, bearing in mind that pursuant to Rule 56(c) of the FEDERAL RULES OF CIVIL PROCEDURE, summary judgment may only be entered when there are no genuine issues as to any material fact and the moving party establishes that it is entitled to summary judgment as a matter of law. *First*

---

1. *See Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). *See gener-*

*ally Jaffee v. United States,* 663 F.2d 1226, 1235–38 (3d Cir.1981), *cert. denied,* 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982).

*Pennsylvania Bank and Trust Company v. United States Life Insurance Co.*, 421 F.2d 959 (3d Cir.1969). "Inferences to be drawn from underlying facts contained in the evidential sources submitted to the trial court must be viewed in a light most favorable to the party opposing the motion. The non-movant's allegations must be taken as true and, when these assertions conflict with those of the moving party, the former must receive the benefit of the doubt." *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976).

■ With respect to the first element of the government contact defense, defendants must prove that the government established the design and specific characteristics of the helicopter. If, however, the contract "set forth merely a 'performance specification,' as opposed to a specified product, then the government contract defense would be far more restricted...." *In re "Agent Orange" Product Liability Litigation*, 534 F.Supp. 1046, 1056 (E.D.N. Y.1982). Defendants allege that the helicopter was manufactured and delivered to the Navy pursuant to a contract that referenced many detailed specifications. Defendants rely chiefly on the October 23, 1981 deposition testimony of Captain Jesse B. Morris, then the Chief Staff Officer for the Office of Naval Research in Washington, D.C. Based on Captain Morris' deposition testimony, defendants conclude that the flight control system and fastening devices within that system were built by defendant Sikorsky exactly as the Navy required, in strict adherence to the Navy's detailed military specifications. According to defendants, that is the conclusion of the Navy, which accepted delivery of the aircraft, and that is the conclusion of Captain Morris, who was in charge of all engineering and design work done on the aircraft.

Plaintiffs, however, have presented some facts tending to controvert defendants' conclusions. Plaintiffs' argument is that, although the Navy had general specifications applicable to all aircraft, the actual design of the helicopter, including the choice of the control system, was performed by defendants and not by the Navy. In support of this contention, plaintiffs have presented to the Court the prior testimony of a Sikorsky witness, Peter Sevenoff, a standards engineer for Sikorsky, in the case of *Donald R. McLaughlin and David Claud Heiter v. Sikorsky Aircraft, et al.*, California Superior Court, San Diego County, No. 405621 and No. 411827, in which Sevenoff testified as follows:

Q. Sir, is it a fact that this aircraft was designed and built by Sikorsky Aircraft?

A. Yes.

Q. Naval Air Systems Command doesn't have any design engineers on its staff that are in the business of designing aircraft, do they?

A. Not that I know of.

Q. In fact, the specifications for this helicopter were created by Sikorsky Aircraft and submitted to the Naval Air Systems Command for approval?

A. *Detailed specifications were created by Sikorsky.*

Q. And submitted to the Naval Air Systems Command for approval?

A. That is correct.

In light of this evidence, and in the context of a motion for summary judgment, this Court cannot conclude as a matter of law that defendants have established the first element of the government contract defense. If it is established at trial that "the United States neither *set* specifications for the system (other than general outlines of what type of system it required) nor *approved* [defendants'] final reasonably detailed specifications (by examining and agreeing to a detailed description of the workings of the system), then defendants may be subject to strict liability under the rule set forth in section 402A [of the RESTATEMENT (SECOND) OF TORTS]." *McKay v. Rockwell Intern. Corp.*, 704 F.2d 444, 453 (9th Cir.1983). Defendants' burden of proof on this particular element is not particularly heavy, however. "[A]ll that is necessary on this element of the defense is for defendant to prove that the product it supplied was a particular product specified by the government." *In re*

"*Agent Orange*" *Product Liability Litigation,* 534 F.Supp. at 1056. In *Koutsoubos,* this Court found that the first element was established through the affidavit of a Boeing Vertol senior contract administrator and its supporting exhibits which represented that "[t]he contract between defendants and the Navy required defendants to furnish 85 Model CH–46A helicopters, including helicopter number 15210, which crashed in March 1979 while carrying plaintiff's son." 553 F.Supp. at 343.

The second element of the government contract defense entails a comparison between the government's specifications and the characteristics of the product. If methods of manufacture were specified, they would be examined as well. *Id.* at 342. "Failure of a defendant to conform to the specifications would defeat the defense only if the discrepancy between specifications and product was a material one...." 534 F.Supp. at 1057. The Court notes, initially, that this second element would obviously be moot if defendants fail to establish that the specifications in question were either set or approved by the Navy.

On the state of the present record, and in the absence of a specific finding with respect to the first element, it is not possible for this Court to determine whether the flight control system supplied by defendants conformed to specifications designed by the Navy. The Court notes, however, that if it is established at trial that the Navy tested and inspected the flight control system and determined it to meet its own material design specifications, then defendants will have met their burden with respect to the second element of the government contract defense as it relates to the design specification deviations alleged by plaintiffs in Docket Entry No. 82 at 4–6. *See* 553 F.Supp. at 343–44.

Finally, as respects the third element of the government contract defense, defendants must prove that "the government knew as much as or more than the defendant about the hazards" of the product. Accordingly, at trial "defendants must show that they were 'not aware of hazard-causing deficiencies in the specifications as to the design or method of manufacture, deficiencies which, if known to the government, might have altered the government's decisions as to whether and how to use the [product].'" 553 F.Supp. at 344. Upon such a showing, in addition to the establishment of elements one and two, the defendants will be protected from liability by the government contract defense.

The Court further notes that, under this third element of the defense, "it is appropriate to address plaintiffs' argument that the government contract defense does not apply in a situation where the government consulted with the contractor in establishing the specifications for the product. As Judge Pratt noted in *Agent Orange,* however, evidence of defendant participation in preparation of the specifications could not defeat the government contract defense, although such evidence might be 'relevant in establishing the relative degrees of knowledge as between the government and the defendants.' 534 F.Supp. 1056." 553 F.Supp. 344.

Defendants' motion for summary judgment will be denied.