### 3. Harm To Defendant If Preliminary Injunction Granted

 Defendant argues that a balance of the equities and potential harm favor denial of a preliminary injunction. However, the equities do not favor defendant due to the evidence that defendant's breach of the restrictive covenant was willful and that defendant fraudulently attempted to conceal his breach. *See Finding of Fact No. 14.* Moreover, the harm to defendant is slight when compared to the potential harm to plaintiff. Plaintiff stands to lose part of a competitive edge that has taken over forty (40) years to develop, whereas defendant has a wide market of job opportunities with companies that do not compete with plaintiff. *See Findings of Fact Nos. 5–7.*

### 4. The Public Interest

 The final factor is whether the public interest supports the issuance of a preliminary injunction. Here, the public interest in protecting valid trade secret information and enforcing valid employment contracts justifies preliminary injunctive relief.

For the foregoing reasons, a preliminary injunction is entered this day enjoining defendant from working for ICN or otherwise disclosing plaintiff's trade secrets.

In re AIR CRASH DISASTER AT
MANNHEIM, GERMANY ON
SEPTEMBER 11, 1982.

Ursula J. SCHOENBORN, et al.

v.

The BOEING COMPANY.

No. MDL 555.
Civ.A. No. 82–4339.

United States District Court,
E.D. Pennsylvania.

May 15, 1984.

Phillip Silverman, Washington, D.C., James J. McCarthy, Los Angeles, Cal., for plaintiffs.

Hastings Griffin, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

This action arises out of a helicopter crash near Mannheim, West Germany on September 11, 1982. The helicopter (helicopter 22292), a United States Army CH–47C "Chinook", was designed, manufactured, and assembled in Pennsylvania by

Boeing-Vertol, a division of defendant Boeing. As a result of the accident, all forty-six members of the crew and passengers on board were killed. The crash was caused by the blade to blade contact of the helicopter's tandem rotor blades due to a failure of its synchronization system.

Numerous actions were brought against Boeing by foreign and American personal representatives and next of kin. Because the liability issues in each action were identical, this court consolidated the actions in a Memorandum Opinion and Order dated October 25, 1983, 575 F.Supp. 521, and a jury trial was held on the issue of liability only. The jury found in favor of the plaintiffs, and answered each of the special interrogatories in favor of the plaintiffs.[1]

Presently before this court is the motion of the defendant for a judgment notwithstanding the verdict or, in the alternative, a new trial. For the reasons which follow, the motion is denied.

## MOTION FOR JUDGMENT N.O.V.

 To grant a motion for a judgment n.o.v., the court must find as a matter of law that the plaintiff failed to adduce sufficient facts to justify the verdict. *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1210 (3d Cir.1970), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); *Marks v. Mobil Oil Corp.*, 562 F.Supp. 759, 764 (E.D.Pa.1983). The motion "may be granted only when, without weighing the evidence, there can be but one reasonable conclusion as to the proper judgment." *Woodward and Dickerson, Inc. v. Yoo Hoo Beverage Co.*, 502 F.Supp. 395, 397 (E.D.Pa.1980), quoting Moore's Federal Practice § 50.07 [2] at 50–77. Moreover, on a motion for a judgment n.o.v., the evidence must be viewed in the light most favorable to the party against whom the motion is made and all reasonable inferences must be drawn in that par-

ty's favor. *Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d 793, 796 (3d Cir.1978), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). *Accord, Blair v. Manhattan Life Insurance Co.*, 692 F.2d 296, 300 (3d Cir.1982).

In support of the motion for a judgment n.o.v., defendant first invokes the government contractor defense. "In short, the government contract defense protects a government contractor for liability for acts done by him while complying with government specifications during execution of performance of a contract with the United States." *Hubbs v. United Technologies*, 574 F.Supp. 96, 98 (E.D.Pa.1983). The defendant claims that it may assert the defense because helicopter 22292 was built in strict compliance with an unambiguous government contract.

The plaintiffs, on the other hand, assert that the government contractor defense is applicable only where the specifications set forth in the contract originate with the government. Thus, they claim that the defense is unavailable in this case because the evidence purportedly shows that the government merely supplied the defendant with a general requirement governing the design of the synchronization system while the defendant was the originator of its plans and specifications. Even if the defense is applicable, the plaintiffs contend that it may be overcome by showing that the helicopter was negligently designed and was defective. Given this characterization of the government contractor defense, they aver that the defendant's negligence was an issue to submit to the jury and that the jury's finding of negligence was supported by the evidence.

The evidence introduced at the trial tended to establish that the CH–47 helicopter was designed in the following manner: The Army submitted to Boeing mission require-

---

**1.** The interrogatories read as follows:

 1. Was the defendant Boeing Vertol negligent?

 2. Was the negligence of Boeing Vertol a proximate cause of the accident?

 3. Was the Government's maintenance a superseding cause of the accident?

**4.** Did the defendant Boeing Vertol have final control of the design of the aircraft?

 5. Was the aircraft when delivered by the defendant to the Army, defective?

 6. Was the defect a proximate cause of the accident?

ments and performance specifications. 8 T.R. at 129–130.[2] Essentially, these mission requirements and performance specifications established the parameters of what the Army wanted the helicopter's capabilities to be, e.g. how much weight the helicopter should lift or what its dimensions should be. Pursuant to these requirements, Boeing developed detailed specifications and drawings. 8 T.R. at 129–130; 9 T.R. at 27. These specifications and drawings were submitted to and approved by the Army. 8 T.R. at 73, 130. Included in these design plans were the specifications and drawings relating to the CH–47's synchronization system, whose failure caused helicopter 22292 to crash. 8 T.R. at 121–122. Under the contract between the Army and Boeing, once the helicopters were in production, the Army's approval was required before any design changes can be made. 8 T.R. at 58. There was no contention by the plaintiffs that Boeing failed to comply with the contract specifications in manufacturing helicopter 22292. Based upon the foregoing, this court must now consider whether defendant Boeing is insulated from liability by virtue of the government contractor defense.

The Third Circuit, applying Pennsylvania law in a diversity action, has held that the government contractor defense is available to a defendant, not only in negligence actions, but in actions brought on strict liability and breach of warranty theories as well. *Brown v. Caterpillar Tractor Co.*, 696 F.2d 246 (3d Cir.1982). In *Brown*, an Army reservist was injured when a felled tree came over the blade of a bulldozer he was operating and struck him. The plaintiff sued Caterpillar claiming that he would not have been injured if the bulldozer had been equipped with a protective structure around the passenger seat.

The *Brown* case has not clearly delineated the elements of the government contractor defense. However, *Brown* did expressly hold that a government contractor need not show that it was compelled to follow government specifications. 696 F.2d at 253–254. Thus, a contractor's assertion of the defense will not necessarily be defeated merely because the contractor could have suggested design changes different from the contract specifications. The court stated that the obligation of a contractor is to "execute the government specifications 'carefully.'" 696 F.2d at 254. Accordingly, the Third Circuit reversed the district court's grant of summary judgment to the defendant and remanded for a determination of whether the bulldozer was defective and whether Caterpillar complied with the contract specifications.

While the *Brown* court declined to make compulsion an element of the government contractor defense, it also declined to make any instance of government involvement in creating the specifications a basis for insulating a contractor from liability. Indeed, the court noted its concern for situations in which the government submits only generalized specifications. "We are particularly troubled by the scenario in which the specifications are skeletal, the contract is negotiated, and the contractor, knowing of a high risk of serious harm, fails to install a relatively inexpensive safety device." 696 F.2d at 254, n. 17. The record, however, did not present the court with this scenario. Therefore, the court declined to state what it would do if faced with it.

A more precise statement of the proof required before a government contractor may be insulated from liability was provided by the Eastern District of New York in *In re Agent Orange Product Liability Litigation*, 534 F.Supp. 1046 (E.D.N.Y.1982). The *Agent Orange* approach has subsequently been adopted by two courts in this district. *Hubbs v. United Technologies*, 574 F.Supp. 96 (E.D.Pa.1983); *Koutsoubos v. Boeing Vertol, Div. of Boeing Co.*, 553 F.Supp. 340 (E.D.Pa.1982). Under this approach, in order to succeed on the government contractor defense in the case *sub*

**2.** All references to the trial record will be cited by the day of the trial followed by "T.R." and the page.

*judice*, the defendant must establish the following:

(1) That the government established the specifications for the CH–47 helicopter;

(2) That the CH–47 helicopter manufactured by the defendant met the government's specifications in all material respects; and

(3) That the government knew as much or more than the defendant about the hazards to people that accompanied the use of the CH–47 helicopter.

*See Hubbs*, 574 F.Supp. at 98; *Agent Orange*, 534 F.Supp. at 1055.

■ With regard to the first element of the defense, the *Agent Orange* court stated that "all that is necessary ... is for defendant to prove that the product it supplied was a particular product specified by the government." 534 F.Supp. at 1056. However, the court qualified this requirement by stating that, "If it should appear that the contract set forth merely a 'performance specification,' as opposed to a specified product, then the government contract defense would be far more restricted than described here." *Id.* As previously stated, the testimony in the case *sub judice* established that the Army submitted to Boeing mission requirements and performance specifications, while Boeing prepared the helicopter's specifications and drawings. This evidence was sufficient for the jury to find in special interrogatory 4 that Boeing had final control over the design of the aircraft. This case is, therefore, unlike *Koutsoubos* where it was shown that the Navy established both the general and detailed specifications. 553 F.Supp. at 343–344. Accordingly, we conclude that the government did not establish the specifications for the CH–47 helicopter. Therefore, we need not discuss the last two elements of the *Agent Orange* test.

■ The defendant contends that even if the government did not establish the specifications, the defense may nevertheless be available if the government approved of them. Indeed, the Ninth Circuit so held in *McKay v. Rockwell International Corp.,*

704 F.2d 444 (9th Cir.1983). We decline to follow the Ninth Circuit.

*McKay* listed the following as elements of the government contractor defense:

(1) the United States is immune from liability under *Feres and Stencel,* (2) the supplier proves that the United States established, or approved, reasonably precise specifications for the allegedly defective military equipment, (3) the equipment conformed to those specifications, and (4) the supplier warned the United States about patent errors in the government's specifications or about dangers involved in the use of the equipment that were known to the supplier but not to the United States.

704 F.2d at 451. The court advanced four reasons as a basis for this formulation of the defense. While these rationales may support the application of the defense where the government sets the specifications, based upon the facts in the case *sub judice*, we do not believe that they support its application where the government merely approves the specifications.

First, the *McKay* court stated that holding a "supplier liable in government contractor cases without regard to the extent of government involvement in fixing the product's design and specification would subvert the *Feres-Stencel* rule since military suppliers, despite the government's immunity, would pass the costs of accidents off to the United States...." *Id.* at 449. The *Feres-Stencel* doctrine bars a member of the armed forces who sustains an injury while on active duty from bringing an action against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, and also precludes the United States from indemnifying a third party for damages paid by it to an armed forces member who is injured during military service. *See, McKay,* 704 F.2d at 448. Accordingly, with respect to the civilian plaintiffs in the case *sub judice*, this action would not be barred by the *Feres-Stencel* doctrine because they are not members of the armed forces and because the helicopter crash did not occur

during a military mission. Moreover, this court is not holding the supplier liable "without regard to the extent of government involvement" in fixing the product's design. We are holding that where a contractor establishes a product's detailed specifications and the government merely approves them, the government contractor defense is not available to the contractor.

Second, *McKay* asserts that where the United States approved the design specifications, the judiciary would be thrust into the making of military decisions if suppliers were held liable for design defects. *Id.* at 449. This reasoning, however, ignores the reality that not all decisions regarding the design of military equipment involve military judgments. In the case *sub judice,* the helicopter's crash was caused by the failure of the transmission synchronizing the helicopter's tandem rotor blades. Whether the helicopter is used for civilian or military purposes, the tandem rotor design requires a transmission that can synchronize the rotor blades so as to avoid their collision with one another. There is no imposition of the judiciary upon military decision making by requiring the helicopter to have a synchronization system free from defects so as to enable it to fly safely. Thus, where the design decisions involved do not require any special military expertise, there is no justification for insulating a contractor from liability where the government merely approves of the decision.

Third, the *McKay* court stated that:

[I]t should be noted that in setting specifications for military equipment, the United States is required by the exigencies of our defense effort to push technology towards its limits and thereby to incur risks beyond those that would be acceptable for ordinary consumer goods. A supplier is frequently unable to negotiate with the United States to eliminate those risks.

*Id.* at 449–450. However, as previously mentioned, whether the helicopter is used for a civilian or military purpose, it must be designed so that it can fly safely. This is not a case of the Army pushing the technology to its limits. The tandem rotor design has been used by Boeing for over twenty years. Moreover, the case *sub judice* is not one where the supplier was unable to negotiate with the Army to eliminate the risks since it was the supplier who established the specifications in the first instance.

Finally, *McKay* states that "a government contractor defense provides incentives for suppliers of military equipment to work closely with and to consult military authorities in the development and testing of equipment." *Id.* at 450. While this may be true when the government sets the specifications, it is not true when the specifications are established by the contractor. When the government sets the specifications, a contractor needs to know that it can consult with the government in attempting to follow the government's specifications without incurring liability on itself. However, when the contractor establishes the specifications, the contractor has no incentive to consult with the government if government approval of the specifications is sufficient to insulate a contractor from liability. Accordingly, we hold, in the case *sub judice,* that because Boeing established the detailed specifications and drawings of the CH–47's synchronization system, it is precluded from being insulated from liability under the government contractor defense.

Boeing's second ground in support of its motion for a judgment notwithstanding the verdict is that it cannot be held liable because helicopter 22292 was not unreasonably dangerous for its military purpose at the time it was sold. Pennsylvania has adopted the Restatement (Second) of Torts § 402A[3] and has applied it in a way so as

---

**3.** Section 402A states:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to

liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

to require the court to determine, as a matter of law, whether the product in question is unreasonably dangerous. *See Azzarello v. Black Bros. Co., Inc.,* 480 Pa. 547, 554–560, 391 A.2d 1020, 1025–1027 (1978). Although the phrase "unreasonably dangerous" as used in the Restatement has no independent significance, it does "represent a label to be used where it is determined that the risk of loss should be placed upon the supplier." 480 Pa. at 556, 391 A.2d at 1025. The trial court must determine whether the risk of loss should be placed upon a supplier with an eye toward the social policy underlying Pennsylvania products liability law, 480 Pa. at 558, 391 A.2d at 1026, and must exercise its own judgment in determining "whether the facts alleged by plaintiff, if true, would justify the imposition of strict liability." *Hammond v. International Harvester Co.,* 691 F.2d 646, 650 (3d Cir.1982).

▆ The defendant contends that this court has no basis for determining that the design of helicopter 22292 was unreasonably dangerous for the military's intended use. The defects alleged by the plaintiffs regarding the helicopter's synchronization system included, but were not limited to, the following:

1. Failure to have timely warning devices in the forward transmission to alert the pilot of ongoing failures;

2. Lack of adequate clearance between the synchronization shaft and the air frame fuselage so as to prevent contact between the shaft and the air frame structure;

3. Selection of improper materials for use in the manufacture of the synchronization shaft; and

4. Inadequate and defective oil filters in the forward transmission.

These allegations constituted a sufficient basis for submitting to the jury the issue of

(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although

whether the helicopter was designed defectively. Any one of the defects alleged would support a finding that the helicopter was unreasonably dangerous for its intended use. The fact that the aircraft was intended to be used for a military purpose does not affect our consideration. If the helicopter could not fly safely, it was not fit for any purpose.

The defendant contends, however, in its third ground supporting the motion, that a court is not the proper body to determine whether a military product's design is unreasonably dangerous. In light of its assessment of our defense requirements, the military, according to the defendant, is the only body that can make such a determination. Accordingly, the defendant asserts that this court's disposition of the matter is barred by the political question doctrine. The defendant cites *Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1972), a case growing out of the Kent State disturbances, where it was stated that:

Trained professionals, subject to the day-to-day control of the responsible civilian authorities, necessarily must make comparative judgments on the merits as to evolving methods of training, equipping, and controlling military forces with respect to their duties under the Constitution. It would be inappropriate for a district judge to undertake this responsibility in the unlikely event that he possessed requisite technical competence to do so.

413 U.S. at 8, 93 S.Ct. at 2444–45.

▆ While a court is not an appropriate body for determining our nation's defense requirements, that is not what this court is required to do in the case *sub judice.* The Army made a determination as to the capabilities it thought the CH–47 should have.

(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not brought the product from or entered into any contractual relation with the seller.
Restatement (Second) of Torts § 402A (1965).

This determination was embodied in the performance specifications it submitted to Boeing. The Army contracted with Boeing not only to manufacture the aircraft, but to develop the detailed specifications and drawings needed to implement the performance specifications. Thus, the court is not substituting its judgment for the Army's by determining that the helicopter was unreasonably dangerous. Rather, we find that, given the Army's assessment of the CH–47's performance requirements, the helicopter was not fit for its intended use. The determination that a product is unfit for its intended use is one that courts are required to make in the most ordinary products liability case. Accordingly, we hold that the political question doctrine does not bar this determination in the case *sub judice*.

■ The defendant's fourth contention in support of its motion for a judgment n.o.v. is that absent evidence that the Army would have approved the design changes that the plaintiffs assert were necessary to make the aircraft safe, there was no factual issue on causation to submit to the jury. Under Pennsylvania law, a party's negligence, standing alone, does not render it liable for injuries sustained by another party. Rather, the wrongful conduct must be "a substantial factor in bringing about [a] plaintiff's injury even though it need not be the only factor." *Majors v. Brodhead Hotel*, 416 Pa. 265, 271, 205 A.2d 873, 877 (1965) (citations omitted). Moreover, a "defendant's negligent conduct is not a substantial factor in bringing about the plaintiff's injury if it would have been sustained even if the actor had not been negligent." 416 Pa. at 271–272, 205 A.2d at 877 (citations omitted). Thus, the defendant argues that its negligence was not established as a substantial factor in bringing about the helicopter's crash in the absence of evidence that the Army would have approved of the design changes needed to make the aircraft safe.

■ We do not agree that the record is devoid of such evidence. Between 1966 and 1968, there were three accidents involving the CH–47 resulting from the failure of the helicopters' forward transmissions. 9 T.R. at 131. Sol Binder, Chief of Dynamics System Design for Boeing-Vertol, testified that as a result of the accidents Boeing proposed six engineering changes ("ECPs") to the Army. 9 T.R. at 152. He also testified that five of these proposals were adopted by the Army. *Id.* Construing the evidence in the light most favorable to the non-moving party on a motion for a judgment n.o.v., we conclude that the jury could have reasonably inferred that the Army would have approved of the design changes that the plaintiffs contend were needed to make the helicopter safe had such changes been proposed by Boeing.[4]

The defendant's final argument in support of its motion for a judgment n.o.v. is that the evidence is insufficient to support a finding of negligence because there was no testimony as to the reasonable standard of care with which a military helicopter drive system should be designed. The essence of a complaint grounded in negligence is, of course, that the defendant's conduct fell "below the standard established by law for the protection of others against unreasonable risk of harm." Restatement (Second) of Torts § 282. Analogizing to malpractice cases which require expert testimony to establish the standard of care within a given profession, the defendant asserts that expert testimony was required to establish the standard of care that an engineer would have been required to exercise in designing the CH–47's drive system. The defendant further asserts that there was no such testimony in the case *sub judice*.

■ We are unaware of any Pennsylvania cases which have applied the expert testimony requirement to the engineering profession. Even if we were to impose such a requirement, the plaintiffs clearly

---

**4.** With regard to the plaintiffs' strict liability claim, we also conclude that this testimony is sufficient to have allowed the jury to draw the inference that a design defect caused the helicopter's crash.

complied with it in the case *sub judice.* The plaintiffs presented the expert testimony of Angelo Coronato, a Registered Professional Engineer with a Masters Degree in Engineering Mechanics from Yale University. The defendant did not challenge Coronato's qualifications as an expert witness. 6 T.R. at 44. Coronato testified as to specific defects in the design of the CH–47's forward transmission and the ways in which the transmission could have been designed safely. *See, e.g.* 6 T.R. at 70–76, 81–82, 90, 95–96. Accordingly, the plaintiffs established a standard of care upon which the jury could base a finding of negligence. Having reviewed the evidence and the inferences arising therefrom in the light most favorable to the plaintiffs, this court concludes that the jury's verdict should stand.

## MOTION FOR A NEW TRIAL

 The defendant has raised six grounds in support of its motion for a new trial. "Decisions to grant a new trial rest in the sound discretion of the court..." *Lanza v. Poretti,* 537 F.Supp. 777, 782 (E.D.Pa.1982) (citations omitted). The court may not substitute its own judgment for that of the jury. *Marder v. Conwed Corp.,* 75 F.R.D. 48, 54 (E.D.Pa.1977). "[T]he jury's verdict may be set aside only if manifest injustice will result if it were allowed to stand." 537 F.2d at 782.

First, the defendant contends that the jury should have been discharged following an *ex parte* communication between the court and a juror during jury's deliberations. On the eleventh day of the trial, responding to a request from the jury that the charge be reread, the court reinstructed the jury. 11 T.R. at 7–19. As the jurors returned to the jury room to deliberate, the court clerk informed juror # 5 that, pursuant to her earlier request, the court would speak to her. While counsel were at sidebar, the court announced that he would speak to the juror. 11 T.R. at 25. No objections were made by counsel. The court went to the other end of the bench and briefly spoke to the juror. Upon returning to counsel at sidebar, the court immediately informed counsel of the substance of the conversation with the juror. The court explained that the juror stated that she was feeling some pressure and that she was told to "go back and work on the problem." 11 T.R. at 25.

The following exchange then took place between the court and counsel for the defendant:

MR. GRIFFIN: I don't think one juror should talk to the Court.

THE COURT: I did not ask her to come to me. She asked the court room deputy to speak to me.

MR. GRIFFIN: I don't think you can give individual advice.

THE COURT: I don't think it's advice. I want to keep the jury together. They have been here two weeks. It's not unusual for people on jury duty to feel pressure.

11 T.R. at 25–26. Counsel for the defendant neither moved for the jury's discharge nor requested to voir dire juror # 5. After a discussion on some unrelated matters, counsel for the defendant renewed his exception to the court's discussion with the juror, but again, failed to request that any curative measures be taken. 11 T.R. at 28.

 Not all conversations that a court may have with a juror constitute an error. *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) is instructive in this matter. In that case, after deliberating for six days, the jury informed the court that it was unable to reach a verdict. On the seventh day, the trial judge suggested that he meet alone with the jury foreman. Counsel acquiesced to this suggestion. The transcript of the meeting between the trial judge and the foreman revealed that there was a strong likelihood that the foreman thought that the judge wanted a verdict one way or the other. The transcript of this meeting was unavailable to the parties and they did not receive a full report of the meeting from the trial judge. In concluding that the trial judge committed an error, the Supreme Court stated that:

... it is not simply the action of the judge in having the private meeting with the jury foreman, standing alone—undesirable as that procedure is—which constitutes the error; rather it is the fact that the ex parte discussion was inadvertently allowed to drift into what amounted to a supplemental instruction to the foreman relating to the jury's obligation to return a verdict, coupled with the fact that counsel were denied any chance to correct whatever mistaken impression the foreman might have taken from this conversation, that we find most troubling.

438 U.S. at 462, 98 S.Ct. at 2886.

■ In the case *sub judice,* the court did not issue any supplemental instructions to juror # 5. The juror informed the court that she was feeling some pressure and the court merely suggested to her that she should return to the jury and try to work out the problem. Moreover, counsel had every opportunity to seek curative measures, yet none were requested. Accordingly, we hold that the court's communication with the juror did not constitute a trial error.

The defendant's second contention in support of its motion for a new trial is that the court should have discharged the jury after the plaintiffs' counsel referred to a "hold harmless" agreement between Boeing and the United States Government. On the eighth day of trial, the defendant called Robert G. Fogg, a Boeing contract manager, to testify. On cross-examination, counsel for the plaintiff called Fogg's attention to page 56 of the contract between Boeing and the Army which contained a list of Armed Services Procurement References ("ASPERS"). 8 T.R. at 104. The following exchange then took place among counsel for the plaintiffs, Fogg, and counsel for the defendant:

Q Yes. Now one of those ASPERS is Item 38 which is listed on page 56, and that is 7–104.45A; is that right?

A Item 38?

Q Yes, sir.

A Yes.

Q That's something that you are familiar with, are you not?

A You mean the limitation of liability for defects?

Q Yes.

A I have read the clause.

Q Yes, and under that clause isn't it correct, sir, that even if the aircraft were to have an accident as a result of a design or manufacturing defect that the Government under this Armed Services Procurement Regulation agrees to hold Boeing harmless?

A I have not read the clause in a very few years. It is a standard ASPER clause that's usually accepted.

Q All right. Let me show you this exhibit that I have marked as 157, and ask you if you recognize that as the ASPER clause that would have been applicable in that contract?

MR. GRIFFIN: If your Honor please, I object to this and move that it be stricken. I don't see what conceivable relevance it has in this law suit.

MR. SILVERMAN: It is part of the contract.

THE COURT: Mr. Griffin.

MR. GRIFFIN: Your Honor, I have made my objection. The mere fact that it is part of the contract does not make everything in it relevant to the law suit.

I think people should be told to ignore it.

THE COURT: I will sustain the objection.

8 T.R. at 105–106.

■ A reference by counsel to a defendant's insurance coverage may constitute misconduct which justifies a new trial. *Cuccarese v. Soloman,* 405 F.2d 866 (2nd Cir.1969). The reasons for prohibiting references to insurance coverage before a jury are:

that the jury may be tempted to assess liability where none exists or to arrive at an excessive verdict based on sympathy for an injured plaintiff with the thought that it is not the defendant personally, but an insurance company, which will

ultimately be called upon to bear the burden of payment of the verdict. *Nicholson v. Garris*, 418 Pa. 146, 151, 210 A.2d 164, 166 (1965). However, where a reference to insurance merely constitutes an isolated incident, as opposed to a continuing pattern of conduct, the risk of prejudicial error may not be sufficient to justify a new trial. *See City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749 (6th Cir.1980).

■■■ Based upon the record cited above, we conclude that the reference to the hold harmless provision of the ASPER clause in the case *sub judice* does not constitute a basis for granting a new trial. First, while virtually all jurors will understand the significance of insurance coverage, it is not clear that many of them will comprehend the meaning of a hold harmless provision. This term was not explained at any length to the jury. Second, the hold harmless provision was mentioned a single time in front of the jury during the course of an eleven day trial. It was, therefore, an isolated incident and not part of any pattern of misconduct. Finally, even if the jurors believed that the government would hold Boeing harmless for injuries resulting from design or manufacturing defects, the risk of prejudice is not as great as when a jury learns that a private insurance company is the defendant's insurer. This is because the jurors in the case *sub judice* could have believed that they, as taxpayers, would ultimately pay for any assessment of liability against Boeing. Thus, reference to the hold harmless provision was not prejudicial.

■■■ The defendant next asserts that the court erred in admitting testimony concerning burrs (metal edges) in the lubrication jets of the forward transmissions in CH–47 helicopters other than helicopter 22292. Boeing contends that the plaintiffs admitted that burrs were not a part of their case. The record, however, does not reflect an admission by plaintiffs that burrs were not a part of their case. Therefore, we need not consider this contention.

As its fourth ground in support of the motion for a new trial, the defendant lists several objections to the charge and the special interrogatories submitted to the jury. First, Boeing asserts that the court erred in declining to hear its objections to the special interrogatories prior to the commencement of closing arguments in front of the jury. On the tenth day of the trial, before the closing arguments were begun, the court submitted to counsel the interrogatories that the jury would be asked to consider. 10 T.R. at 10. Counsel for the defendant then asked, "Does your Honor want to hear anything about these [the interrogatories] at the moment?" *Id.* The court responded, "No, you have an automatic exception to it, and I'll be glad to hear anything that you want to say." *Id.*

■■■ Rule 49(a) of the Federal Rules of Civil Procedure provides, in part:

> The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue.

Since this rule requires a court to instruct a jury when special interrogatories are submitted, the rule should be read in conjunction with Fed.R.Civ.P. 51 which governs instructions. In addition to permitting parties to file requests for jury instructions with the court, Fed.R.Civ.P. 51 provides:

> The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed.

Although Rule 49(a) is silent as to when a court must show counsel the special inter-

rogatories, this rule must be read together with Rule 51 to require that the interrogatories be submitted to counsel prior to the closing arguments. "Otherwise counsel will have been deprived of the opportunity to request instructions on what may be very significant issues in the jury's deliberation." *Smith v. Danyo*, 585 F.2d 83 (3d Cir.1978).

■ The record clearly shows that the court complied with the applicable rules in the case *sub judice*. As required by the rules, the interrogatories were shown to counsel prior to the beginning of the closing arguments. The purpose of the rules' requirement is to permit counsel to request instructions on the law applicable to the interrogatories. Since the parties discussed the jury instructions prior to the closing arguments, 10 T.R. at 18–19, the fact that objections to the interrogatories themselves were not heard before the closing arguments does not constitute an error.

■ Moreover, assuming, *arguendo*, that an error was made, it must be characterized as harmless. After the closing arguments were completed, but before the jury was instructed, the parties were given a full opportunity to raise objections to the special interrogatories. 10 T.R. at 120–123. None of the interrogatories submitted by the court prior to the closing arguments were changed as a result of the defendant's objections. Accordingly, the fact that the court did not hear objections to the interrogatories when they were submitted did not affect the substantial rights of the parties so as to require a new trial. *See* Fed.R.Civ.P. 61.

Second, regarding the jury charge and interrogatory 4, the defendant asserts that they incorporated an incorrect statement of the government contractor defense. Interrogatory 4 required the jury to consider the following:

4. Did the defendant, Boeing Vertol have final control of the design of the aircraft?

■ As previously stated, the first element of the government contractor defense requires a determination as to whether the government established the specifications for the CH–47 helicopter. Since the identity of the party having final control over the aircraft's design is crucially relevant to this element of the defense, the interrogatory incorporated the correct legal standard. For the same reason, portions of the jury charge which included the concept of "final control" were also not in error.

Third, defendant claims that interrogatory 5 should not have been submitted to the jury. Interrogatory 5 asked:

5. Was the aircraft when delivered by the defendant to the Army, defective?

On the ninth day of the trial, Sol Binder, testifying for the defendant, stated that, in his opinion, if the Army had adopted an engineering change proposal submitted by Boeing known as "ECP 422", then the accident at Mannheim would not have occurred. 9 T.R. at 132–134. The defendant argues that interrogatory 5 fails to account for this evidence and gives the jury no guidance for considering it. Boeing contends that, given these inadequacies, the jury's affirmative answer to interrogatory 5 was a foregone conclusion.

■ Evidence regarding ECP 422 could have, in fact, been considered by the jury in answering interrogatories 2 and 6 which related to the issue of proximate cause. If the jury believed that the Army's adoption of ECP 422 could have prevented the accident, then the jury could have found that Boeing's negligence or the helicopter's defect was not a substantial factor in causing the accident and was, therefore, not its proximate cause. Thus, if the jury's affirmative answer to interrogatory 5 was a foregone conclusion, it was not because the jury lacked a framework for considering ECP 422.

The defendant's fifth contention in support of the motion for a new trial is that the court erred in submitting to the jury the issue of whether the clearance between the synchronization shaft and the aircraft's fuselage at a point known as Station 120 was adequate. In its charge to the jury, the court stated that, "the plaintiffs con-

tend that the defendant defectively designed the Chinook CH–47C due to insufficient clearance between the synchronization shaft and main frame area at Point 120." 10 T.R. at 130. The defendant asserts that the plaintiffs presented no evidence indicating that the clearance was defective or negligently designed.

■ The record, however, does not support this assertion. The plaintiffs' expert witness, Angelo Coronato, was asked the following with regard to three prior accidents involving the CH–47 helicopter:

> Q Now, have you formed an opinion, sir, as to what reasonable steps from a design standpoint were necessary to take as a result of those prior accidents to do something about this problem existing at Station 120?
>
> A Well, as a result of those earlier accidents, it was a bit obvious that if you do get a failure and in the input pinion pack assembly, as is here, that the sync-shaft will become unstable and contact Station 120. And there are a number of solutions that should have been considered and could have been considered at that point in time.

6 T.R. at 95. One of the solutions Coronato discussed included the following:

> A Well, one, they could have looked into actually making this section of the shaft of steel rather than aluminum, so that it would buy the pilot more time if it is rubbing against the Station 120.

10 T.R. at 95–96. The obvious import of this testimony was that the clearance between the synchronization shaft and the fuselage was inadequate. Moreover, the plaintiffs' expert suggested design changes which could have alleviated the clearance problem. Accordingly, the court did not err in submitting the issue of the clearance problem to the jury.

As a final ground in support of the motion, the defendant raises objections to two of the court's evidentiary rulings. First, the defendant contends that the court erred in admitting into evidence a report prepared by the Corpus Christi Army Depot's Analytical Investigations Branch ("AIB").

The AIB report was an exhibit which was attached to the United States Army Collateral Accident Investigation Report (the "JAG Report"). Included in the AIB report was a recommendation that the clearance between the synchronization shaft and fuselage be increased. The defendant sought to introduce the factual findings of the JAG report into evidence, but objected to the admission of the accompanying exhibits (including the AIB report). The court, however, granted the plaintiffs' motion to admit the entire JAG report, including the exhibits. 9 T.R. at 68–69.

■ The Federal Rules of Evidence provide for a public records exception to the hearsay rule. Fed.R.Evid. 803(8). Relevant to the JAG Report is subsection (C) of this rule which provides, in civil actions, for the admission of:

> factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Although what constitutes a "factual finding" for the purposes of subsection (C) has been the subject of some controversy, it is now settled that evaluative reports (i.e. those containing normative conclusions in addition to a recitation of facts) are admissible. *Zenith Radio Corp. v. Matsushita Electric Industrial Co. Ltd.*, 505 F.Supp. 1125 (E.D.Pa.1980) (hereinafter "the *Japanese Antitrust Litigation*"), *rev'd on other grounds*, 723 F.2d 238 (3d Cir.1983); *Melville v. American Home Assurance Co.*, 443 F.Supp. 1064 (E.D.Pa.1977). Accordingly, there is no question that the JAG report itself is admissible under Fed. R.Evid. 803(8)(C). The admissibility of the JAG report's accompanying exhibits, however, presents a more difficult problem.

In the *Japanese Antitrust Litigation*, the district court was presented with a 17,000 page pre-trial statement from the plaintiffs which was based on approximately 250,000 documents. 505 F.Supp. at 1125. Faced with the grueling task of determining the admissibility of these docu-

ments, the court needed a way of weeding out documents that were only tangentially related to the case. In considering the scope of Fed.R.Evid. 803(8)(C), the court concluded:

> that so long as the trustworthiness criteria are met..., where a staff report contains factual averments that are not mere recitations of evidence, but rather reflect conclusions made by the staff on the basis of evidence before it, those averments may be admitted as 803(8)(C) "findings." Where, however, the staff report is submitted to a commission or other public agency charged with making formal findings, only those factual statements from the staff reports that are approved and adopted by the agency will qualify as 803(8)(C) "findings." (citation omitted)

505 F.Supp. at 1145. This definition of "findings" was based upon the court's preception that the drafters of the Rules did not intend "to piggyback the whole administrative proceeding on top of the tribunal." *Id.* To do so, the court explained:

> would permit vast amounts of time to be spent addressing the admissibility of exhibits which are but excess baggage with no direct bearing on the issues at trial. Such a result would, indeed, offend the basic constructional rule, F.R.E. 102, one of whose precepts is the "elimination of unjustifiable expense and delay," as well as the principles underlying Rule 403.

*Id.* In sum, then, the court excluded exhibits attached to agency reports to prevent a waste of judicial resources and to avoid the risk of prejudice and confusion with which Fed.R.Evid. 403 is concerned.[5]

While the potential for the waste of judicial resources and the confusion of the fact finder was very great in an antitrust case involving 250,000 documents, the potential for these dangers was not nearly as great in the case *sub judice.* First, no judicial resources were compromised by the admis-

sion of the exhibits accompanying the JAG report. The district court, in the *Japanese Antitrust Litigation,* was faced with the prospect of considering exhibits to several thousand documents. This court, on the other hand, was required to consider only 29 exhibits attached to a single document. Second, the exhibits admitted into evidence, did, in fact, have a direct bearing on the issues at trial. The AIB report supports the plaintiffs' contention about the adequacy of the clearance between the synchronization shaft and the fuselage at Station 120. Third, the risk of confusing the jury was greatly minimized because neither the JAG report nor the attached exhibits were allowed to accompany the jury into the deliberation room. Thus, the jurors were not inundated with a mass of papers and they heard counsel make only limited references to the documents at trial. Given the relevancy of the exhibits and the lack of undue prejudice their admission would cause the defendants, the documents were admitted in the interest of developing a full record.

The case *sub judice* is factually similar to *Complaint of American Export Lines, Inc.,* 73 F.R.D. 454 (S.D.N.Y.1977). In *American Export,* the United States Coast Guard convened a Marine Board of Investigation to ascertain the cause of a collision between two ships in New York harbor. The court held that the exhibits to the Marine Board of Investigation report were admissible under Rule 803(8). Accordingly, we hold that the exhibits to the JAG report, like those of the Marine Board report, are admissible, and that the defendant was not prejudiced by their admission. We further hold that there is no basis for asserting a lack of trustworthiness in the sources of the exhibits. Rule 803(8) "assumes admissibility in the first instance," Advisory Committee Notes to Rule 803(8), and the defendant presented no grounds

---

**5.** Rule 403 states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

indicating that the sources of the exhibits were untrustworthy.

The defendant's second objection to an evidentiary ruling of this court is based on what it characterizes as the court's refusal to permit Boeing to argue from evidence concerning the Army's rejection of a Boeing recommendation to increase the clearance at Station 120. After the accident at Mannheim, Boeing proposed an engineering change known as ECP 747 which called for an increase in the clearance at Station 120. This ECP was rejected by the Army.

The court, however, did not preclude the defendant from arguing this evidence to the jury. The defendant was merely precluded from asserting that this evidence was probative of what the Army would have done prior to the accident. The defendant was not precluded from using this evidence for other purposes.

Based upon the foregoing, the defendant's motion for a new trial is denied.