**Gary E. RAMEY, et al.**

v.

**MARTIN–BAKER AIRCRAFT CO.**

**Civ. A. No. N–85–3143.**

United States District Court,
D. Maryland.

March 19, 1987.

Patrick A. O'Doherty, and Thomas B. Wheeler, Baltimore, Md., and David M. Williams, Chestertown, Md., for plaintiffs.

Jay I. Morstein, Deborah L. Robinson, and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for defendant Martin-Baker Aircraft.

Joseph G. Finnerty, Jr., and Andrew E. Shipley, Baltimore, Md., for defendants McDonnell Douglas Corp. and Quinten Rix.

Thomas E. Waller, pro se defendant.

## MEMORANDUM

NORTHROP, Senior District Judge.

This lawsuit arises out of an accident at the Naval Test Center at Patuxent River, Maryland. Plaintiff Gary Ramey, an aircraft mechanic, suffered a serious injury while attempting to remove an ejection seat from a Navy F–18 aircraft. Following the accident, Gary and Amanda Ramey[1] initiated suit against McDonnell Douglas Corporation ("McDonnell"), Martin-Baker Aircraft Company Ltd. ("Martin-Baker"), Quinton Rix ("Rix") and Thomas Waller ("Waller") in the Circuit Court for St. Mary's County, Maryland. Following the Circuit Court's grant of summary judgment in favor of McDonnell,[2] the defendants removed the case to this Court on the basis of diversity jurisdiction. 28 U.S.C. § 1332. In a Memorandum and Order dated May 20, 1986, this Court granted defendant Rix's motion for summary judgment.[3] Presently before this Court is Martin-Baker's motion for summary judgment based on the government contract defense. After a careful review of the pleadings and supplemental documentation submitted by the parties, the Court finds that no hearing is necessary. Local Rule 6.

### I.

On October 27, 1981, Rix, a McDonnell assistant foreman, assigned Ramey and Waller, another mechanic, the task of removing a Martin-Baker SJU–5 ejection seat from Full Scale Development ("FSD")[4] F–18 Aircraft No. 3 for the purpose of performing maintenance. The ejection seat is intended to provide pilots with an automatic emergency escape route. It operates by way of a catapult behind the ejection seat which is powered by the firing of

---

1. Mrs. Ramey's claim is for loss of consortium.

2. The Circuit Court noted that, although Ramey was directly employed by Kirk-Mayer, Inc., McDonnell was Ramey's statutory employer (MD.ANN CODE Art. 101, § 62 (1979)) because McDonnell had subcontracted out to Kirk-Mayer work which the court found to be 1) an essential and integral part of the Navy; and 2) within the trade, business, or occupation of McDonnell. Thus, plaintiffs' exclusive remedy against McDonnell was Maryland's workers compensation system. *See* Opinion and Order of Court (St. Mary's Co. July 16, 1985).

3. The Court held that Rix was not liable as Ramey's supervisory co-employee under the standards set forth in *Athas v. Hill,* 300 Md. 133,

476 A.2d 710 (1984). Plaintiffs filed an amendment complaint against Rix which was dismissed for plaintiffs' failure to seek leave to amend and because the amended complaint would not alter the Court's previous grant of summary judgment to Rix. Thereafter, plaintiffs filed a motion for leave to file an amended complaint and a motion for reconsideration. Both motions were denied.

4. FSD aircraft are developed prior to the production of front line aircraft. These pre-production models are sent to the purchaser for the purpose of evaluating the aircraft's response to certain flight conditions.

three ballistic charges. A rocket motor under the seat provides additional propulsion to propel the seat from the aircraft. An F–18 air crewman need only pull an ejection handle located between the crewman's legs to initiate the ejection process. Upon ejection, trip rods fixed to the aircraft structure pull sears from the drogue gun and the time release mechanism ("TRM").[5] Thus activated, the drogue gun fires and deploys two small drogue parachutes, which immediately act as a stabilizing brake for the seat and its occupant. The TRM, or the "brains" of the seat, delays the release of the drogue parachute and the separation of the crewman from the seat until the seat reaches a safe speed, position and altitude. The SJU–5 ejection seat is designed to permit a safe ejection from both a stationary F–18 aircraft on the flight deck of an aircraft carrier and from an F–18 moving at speeds of 600 knots at any altitude.

There is no genuine dispute that the assignment of removing the SJU–5 ejection seat from FSD Aircraft No. 3 is potentially dangerous due to the very nature of the components making up the ejection system.[6] On the day of the accident, this danger was compounded by three unfortunate circumstances. First, neither Ramey nor Waller was qualified to remove the ejection seat from the aircraft. Second, the portable cranes customarily used to lift ejection seats out of cockpits were not available. This meant that the ejection seat had to be removed by manually disassembling its various pieces. Lastly, Ramey and Waller followed McDonnell's admittedly ambiguous instructions,[7] known as Quality Planning Instruction Sheets ("QPIS"), for removal of the ejection seat bucket and ejection seat. (*See* Defendant's Exh. 5, QPIS 74–82–06; Defendant's Exh. 6, QPIS 74–82–02).

Following a logical interpretation of McDonnell QPIS 74–82–06 for seat bucket removal, Ramey and Waller removed the seat bucket and the entire safety pin set, which, when installed, prevent the ballistic rocket and catapult components from firing.[8] It appears from the record that, while it may have been wrong to remove all of the safety pins, it was impossible to remove less than all of the pins because they were centrally connected.[9] Once all of the pins were removed, the ejection seat was like a "gun with its safety off." (Charleville Dep. at 147).

Ramey and Waller next turned to QPIS 74–82–02 for guidance on how to remove the remainder of the seat. There is some dispute as to whether this QPIS was the correct instruction to follow for manually

---

5. The trip rods hold the firing lever of the drogue gun and the TRM in place. The force of the seat being catapulted from the cockpit upon initiation of the ejection sequence causes the rigid trip rods to direct this force to the firing levers which withdraw the sears from the firing pin. The firing pin then rises up from the force of a spring below it and strikes the cap of the cartridges in the drogue gun and TRM causing them to detonate. (Defendant's Exh. 9 at pages 18–25).

6. McDonnell's maintenance procedure required that the ejection seat be removed with the drogue gun and time release ballistic charges in place. (Defendant's Exh. 7; *see also* footnote 5 for an explanation of the fully armed ejection seat firing sequence.)

7. *See* Defendant's Exh. 1, Hazard-Incident Report at 4; Charleville Dep. at 133–34.

8. Instruction 9 of QPIS 74–82–06 reads: "Disconnect ejection seat aircraft grounded maintenance pin set for seat bucket removal."

9. Mr. Joseph Clarkville, McDonnell's Unit Chief and ejection seat specialist for the F–18 aircraft, testified at deposition that it was wrong and dangerous for Ramey and Waller to have removed all of the ejection safety pins, including the drogue gun and TRM safety pins. (Clarkville Dep. at 96). Supervisor Rix, however, testified that he interpreted the plain language of the instructions to call for removal of the entire ejection seat safety pin set. (Rix Dep. at 51, 58–59). Moreover, Rix stated that it was impossible to remove just the seat bucket and its safety pins while leaving the remaining four safety pins in place, as all six safety pins in the McDonnell set were centrally connected. (Rix Dep. at 58).

The Martin-Baker safety pin set, which McDonnell was not using on the FSD aircraft, permitted the removal and installation of individual safety pins. (Burrell Affidavit, ¶ 16.)

removing the seat.[10] In any event, following this QPIS, Ramey and Waller disconnected the trip rods from the aircraft structure and left them dangling from the firing sears on the ballistic TRM and the ballistic drogue parachute gun, despite instructions 9 and 12 of QPIS 74–82–02 which require the trip rods to be secured to the ejection seat. (Defendant's Exh. 6 at ¶¶ 9, 12). Ordinarily, this would not have created a dangerous situation, but as the safety pins for these ballistic components had been removed, the trip rods on the FSD aircraft would fire the ballistic charges in the components if either rod was pushed downward or upward. (Burrell Affidavit at ¶¶ 10, 15; Charleville Dep. at 140–42, 146).

Ramey then stood above the aircraft cockpit, straddling the ejection seat, and attempted to lift the seat out of the cockpit. Realizing that the seat was too heavy, Ramey dropped it back into the cockpit. According to the Navy and McDonnell investigators, the lowering of the ejection seat caused the unsecured TRM trip rod to contact the hull of the aircraft. This caused sear removal which, in turn, fired the drogue gun ballistic charge. (Defendant's Exh. 1 at 9). Ramey fell from the aircraft when the ballistic charge detonated and injured himself.

In the complaint, plaintiffs assert product liability claims against Martin-Baker based on theories of negligence, breach of warranty and strict liability. They elaborate on these theories in their opposition to the summary judgment motion by stating that the design of the trip rod, firing lever and sears components of the ejection seat was defective in that these components could be activated by either a downward force or an upward force, notwithstanding the fact that only a downward force was contemplated for emergency ejection purposes. Thus, plaintiffs conclude that, if the components had been designed as a single-action device, the inadvertent detonation would not have been possible and the accident involving Ramey would not have occurred. Further, plaintiffs assert that Martin-Baker should have placed a warning on the ejection seat cautioning that the ballistic cartridges be removed prior to seat removal. Lastly, plaintiffs claim that Martin-Baker should have provided instructions such that maintenance on the ejection seat could be performed safely.

Martin-Baker has moved for summary judgment asserting that the government contract defense bars plaintiffs' claims.[11] Both parties have blurred the issues and Martin-Baker has not fully addressed all of plaintiffs' claims. However, for the reasons stated below, this Court holds that Martin-Baker is entitled to the government contract defense as to plaintiffs' design defect claims. For reasons elaborated in part III of this Memorandum, summary judgment will not be granted to Martin-Baker on the claims that it failed to place a warning on the ejection seat and failed to provide maintenance instructions.

## II.

### A. The Government Contract Defense

■ The government contract defense is founded on the doctrine of sovereign immunity and the theory that, if a contractor manufactures a product according to government specifications, it is entitled to share in the government's privilege of immunity and is protected by that immunity to the extent that the government would be protected had it manufactured the product itself. See Note, *Liability of a Manufacturer for Products Defectively Designed by the Government*, 23 B.C.L.Rev. 1025, 1051 (1982) (hereinafter cited as "Note");

---

10. Mr. Charleville testified at deposition that this QPIS was not applicable to removal of an ejection seat by manual disassembly, because QPIS 74–82–02 called for removal of the seat by crane with the seat bucket in place. (Charleville Dep. at 97–101; Defendant's Exh. 6 at ¶ 17.) Rix, however, believed this QPIS was appropriate. (Rix Dep. at 51–53.) It is not clear whether another QPIS existed which related to removal of the seat by manual disassembly. (Charleville Dep. at 97–101.)

11. The standards governing a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure are well established and need not be repeated here. See *Weinberger v. Bristol Myers*, 652 F.Supp. 187 (D.Md.1986).

*In Re Agent Orange Products Liability Litigation,* 506 F.Supp. 762, 792 (E.D.N.Y. 1980) (hereinafter referred to as *Agent Orange I* ). The defense developed in response to claims against public work contractors for property damage. *See* Annot., *Right of Contractor with Federal, State, or Local Public Body to Latter's Immunity from Tort Liability,* 9 A.L.R.3d (1966). The contractor was generally held not liable for damages occurring while carrying out work pursuant to a validly conferred authority under a contract with the government. *Id.; see also Yearsley v. W.A. Ross Construction Co.,* 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940) (this case is generally considered the first case from which the government contract defense is derived); *Johnston v. United States,* 568 F.Supp. 351 (D.Kan.1983). While the government contract defense applies only where a contractor has manufactured a product in accordance with government contract specifications, its justification rests on public policy grounds rather than on negligence principles, because of the government's involvement, and thus, is a complete bar to claims based on strict liability, breach of warranty, as well as negligence.[12] *Tozer v. LTV Corp.,* 792 F.2d 403, 408 (4th Cir.1986); *see also, Tillet v. J.I. Case Co.,* 756 F.2d 591, 597 n. 3 (7th Cir. 1985) (the reasoning underlying the defense applies equally well to design defect cases based on strict liability as well as negligence and breach of warranty).

Recently the defense has been applied frequently in cases involving military equipment suppliers. *Tillet,* 756 F.2d 591; *McKay v. Rockwell International Corp.,* 704 F.2d 444 (9th Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984); *Hubbs v. United Technologies,* 574 F.Supp. 96 (E.D.Pa.1983); *In Re Agent Orange Product Liability Litigation,* 534 F.Supp. 1046 (E.D.N.Y.1982) (hereinafter referred to as *Agent Orange II* ); *Koutsoubos v. Boeing Vertol Division of Boeing Co.,* 553 F.Supp. 340 (E.D.Pa.1982); *Sanner v. Ford Motor Co.,* 144 N.J.Super. 1, 364 A.2d 43 (1976), *aff'd,* 154 N.J.Super. 407, 381 A.2d 805 (1977), *cert. denied,* 75 N.J. 616, 384 A.2d 846 (1978). Although the government contract defense appears at times to operate harshly, there are sound and compelling public policy reasons underlying its application, especially in the context of claims against military contractors. First, without the defense, government contractors and the judiciary would be placed in the untenable position of second guessing the design of military equipment. *See, Tozer,* 792 F.2d at 406; *McKay,* 704 F.2d at 449. *Johnston,* 568 F.Supp. 351; *Hubbs,* 575 F.Supp. 96; *Agent Orange, II,* 534 F.Supp. at 1054. As the Court recognized in *McKay,* questioning military needs and specifications would often require members of the military to testify as to reasons for their decisions and actions which would affect national security. *McKay,* 704 F.2d at 449; *see also, Tozer,* 792 F.2d at 406. Such inquiry would also "thrust the judiciary into making military decisions" and would undoubtedly lead to problems concerning the separation of powers. *Id.*

A second justification of the defense is that, if contractors are held liable for design defects, they will raise the price of the products to cover this risk, and the government will ultimately absorb the cost. *McKay,* 704 F.2d at 449; *Agent Orange I,* 501 F.Supp. at 793–94; *Dolphin Gardens Inc. v. United States,* 243 F.Supp. 824, 827 (D.Conn.1965); *Casabiana v. Casabiana,* 104 Misc.2d 348, 350, 428 N.Y.S.2d 400, 402 (Sup.Ct.1980) (the court concluded that imposing liability on the manufacturer which fully complies with government specifica-

---

**12.** In *Johnson,* 568 F.Supp. at 353–56, the court provided an excellent summary of the so-called government contract defenses which it found to be an amalgam of two separate defenses, the contract specification defense and the government contract defense. The contract specification defense is applicable to products manufactured to order and specification of another, whether that "other" is the government or a private party and applies only to claims of negligence. The government contract defense, which may be invoked only in situations where the product is manufactured in conformity with government specifications, is effective against causes of action based on strict liability and breach of warranty, as well as those based on negligence.

tions will cause manufacturers to shift the added cost of insurance to the government, increasing the cost of government contracts). While strongly criticized by opponents of the defense, particularly in a non-military setting, this justification has great merit where military products are involved because of the potential risk of draining the treasury during wartime, "when the nation can ill afford it." Note, 23 B.C.L. Rev. at 1071.

Possibly the most significant reason supporting the government contract defense is to avoid subverting the underlying policies of governmental immunity established in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950) and *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), and in the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a). In *Feres,* the Supreme Court held that the United States is not subject to liability under the FTCA, 28 U.S.C. § 2674, with respect to injuries incurred by servicemen incident to their military service. The holding of *Feres* was extended in *Stencel,* where the court expressly held that FTCA precludes the United States from indemnifying a government contractor for damages it is required to pay a serviceman who is injured during military service. The *Feres-Stencel* doctrine is a logical expansion of sovereign immunity under § 2680(j) of the FTCA.[13] In addition to this doctrine, the FTCA itself contains an important exception to the waiver of immunity:

> [T]he provisions of this chapter ... shall not apply to (a) Any claim ... based upon the exercise or performance or the failure to exercise or perform a *discretionary function* or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (emphasis added).

Section 2680(a) protects the government against tort liability for administrative errors and in the exercise of its discretionary functions. *See, Dalehite v. United States,* 346 U.S. 15, 34–36, 73 S.Ct. 956, 967–968, 97 L.Ed. 1427 (1953). The Supreme Court has defined a "discretionary function" as an action requiring a "policy judgment and decision" and the term includes "determinations made by executives or administrators in establishing plans, specifications, or schedules of operations." *Id.; United States v. S.A. Empresa de Viaco Area Rio Grandense,* 467 U.S. 797, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984); *Baxley v. United States,* 767 F.2d 1095 (4th Cir.1985). This exception has been recognized or used either explicitly or implicitly to justify applying the government contract defense to civilian plaintiffs. *See, e.g., Dolphin Gardens,* 243 F.Supp. at 827 (in barring the claims against a government contractor, the court stated "[t]o impose liability on the contractor under such circumstance would render the Government's immunity for the consequences of acts in the performance of a 'discretionary function' meaningless, for if the contractor was held liable, contract prices to the Government would be increased to cover the contractor's risk of loss from possible harmful effects of complying with decisions of executive officers authorized to make policy judgments"); *Johnston,* 568 F.Supp. at 358; *see also, Boroki v. United States,* 803 F.2d 1421 (7th Cir.1986); *In Re Air Crash at Manhieim, Germany,* 769 F.2d 115 (3rd Cir. 1985); *cert. denied,* —— U.S. ——, 106 S.Ct. 851, 88 L.Ed.2d 891 (1986); *Burgess v. Colorado Serum Company, Inc.,* 772 F.2d 844 (11th Cir.1985).

Another justification for the contractors defense, in the context of military products, in that the "United States is required by the exigencies of our defense effort to push technology towards its limits and thereby to incur risks beyond those that would be acceptable for ordinary consumer goods." *McKay,* 704 F.2d at 449–50. Thus, in the military contract setting, where the manufacturer is frequently unable to negotiate with the United States to

---

**13.** Section 2680(j) bars any claim against the Government arising out of the combatant activities of the military or naval forces, or Coast Guard during time of war.

eliminate design risks, conventional product liability law is simply inappropriate.

A fifth policy consideration underlying the government contract defense is the incentive it provides to government contractors to work closely with and to consult military authorities in the development of high quality and cost-efficient products. *McKay,* 704 F.2d at 450; *Agent Orange I,* 506 F.Supp. at 794.

A final justification for permitting government contractors to share in the government's immunity from suit is the inherent unfairness of holding the innocent contractor liable when the blame, if any, properly lies with the government. *McKay,* 704 F.2d at 450; *Johnston,* 568 F.Supp. at 357; *Agent Orange I,* 506 F.Supp. at 793–94. Ultimately, imposing such liability on a government contractor would have a chilling effect on businesses' willingness to contract with the government and supply necessary goods and equipment.

Recently, the United States Court of Appeals for the Fourth Circuit, in three separate decisions, set forth the elements of the liability of a government contractor defense in the context of a suit brought by a serviceman for alleged design defects. In that setting, the Fourth Circuit held that a military contractor is not subject to liability where: (1) the United States is immune from suit under the *Feres-Stencel* doctrine; (2) the contractor proves that the United States established, or approved, reasonably precise specifications for the allegedly defective military equipment; (3) the equipment conformed to those specifications; and (4) the contractor warned the United States about patent errors in the government's specifications or about dangers involved in the use of the equipment that were known to the supplier but not to the United States. *Tozer,* 792 F.2d at 408; *Boyle v. United Technologies Corp.,* 792 F.2d 413, 414 (4th Cir.1986); *Dowd v. Textron, Inc.,* 792 F.2d 409, 412 (4th Cir.1986). In these decisions, the Fourth Circuit adopted the elements of the defense set forth in *McKay,* which also involved claims

on behalf of servicemen against a military contractor. *McKay,* 704 F.2d at 451.

In opposing Martin-Baker's motion for summary judgment based on the government contract defense, plaintiffs make three arguments. First, plaintiffs assert that the defense does not apply to Ramey because of his civilian status and because the government is not immune from liability. Second, plaintiffs suggest that the military has not approved a reasonably precise specification for the design of the ballistic sear trip rod system on the SJU–5 seat. Finally, plaintiffs contend that Martin-Baker failed to warn the Navy about dangers involved in the maintenance of the SJU–5 seat that were known to Martin-Baker but not to the Navy. Each of these arguments will be addressed in *seriatim.*

**B.** *Plaintiff's Civilian Status and the Discretionary Function Exception*

■ Plaintiffs contend that the government contract defense is not available to Martin-Baker because of Ramey's civilian status. Plaintiffs base this argument on the holding in the *McKay* case. Plaintiffs' contention is misguided and ignores the history and policy underlying the government contract defense.

In *McKay,* the Ninth Circuit was asked to determine the extent of liability of the Rockwell Corporation for alleged design defects in an aircraft's ejection seat. The plaintiffs were the widows of two pilots killed during the ejection process. Rockwell was under contract with the United States to develop a highly sophisticated Navy aircraft which included a ballistically powered ejection seat. In deciding whether a supplier of military equipment is subject to liability under Section 402A of the Restatement (Second) of Torts for design defects, the *McKay* court analyzed the *Feres-Stencel* doctrine and held that, under § 2674 of the FTCA, the United States would not be subject to liability for direct tort liability or indemnification to Rockwell for damages it might be required to pay. *McKay,* 704 F.2d at 448.

Given the immunities of the United States in cases such as this, the *McKay*

court turned to the question of liability on the part of Rockwell, which had asserted the government contract defense. The Court relied, in part, on *Myers v. United States*, 323 F.2d 580 (9th Cir.1963), and *Dolphin*, 243 F.Supp. 824, in holding that the government contract defense was a viable defense in that circuit. Both of these cases barred claims brought by *civilians* on the basis of the government contract defense. Furthermore, in *Dolphin*, the defense was applied against government contractors when the United States was found immune under the discretionary function of the FTCA § 2680(a). *Dolphin*, 243 F.Supp. at 627.

The *McKay* court went on to state that it was consistent with the United States' limited liability under the *Feres-Stencel* doctrine to construe the government contract defense so as to avoid imposing on the contractor liability for acts attributible to the government. *McKay*, 704 F.2d at 450–51. Under this reasoning, and on the facts presented, the *McKay* court found Rockwell could be immune from suit by combining the presence of the United States' immunity from suit under the *Feres-Stencel* doctrine with the elements of the government contract defense which it held to be: proof of the United States establishment or approval of reasonably precise specifications, compliance with those specifications by the manufacturer, and warnings to the United States from the manufacturer concerning errors in specifications or dangers involved in the use of the equipment that were known to the manufacturer but not to the United States.[14] The *McKay* court relied on the *In Re Agent Orange II* case for support of the duty imposed on the manufacturer to warn the United States. *In Re Agent Orange II*, 534 F.Supp. at 1055.

Thus, it is clear that *McKay* did not limit the government contract defense to suits brought by servicemen, but rather it demonstrates that the most salient justification for the defense is governmental immunity. It just so happens that the source of governmental immunity in *McKay* was the *Feres-Stencel* doctrine. This Court does not agree, however, with the plaintiffs' assertion that the holding of the *McKay* case was intended to limit the application of the government contract defense only to situations where sovereign immunity derives from *Feres* and *Stencel.*

Such a limited interpretation of the defense would be contrary to the numerous other policy justifications underlying the defense and relied on in the *McKay* and *Tozer* cases. If civilians were permitted to bring claims against military contractors in situations where servicemen were not, it would thrust the judiciary into second-guessing the military, pose problems under the separation of powers doctrine, increase costs of military equipment procurement, call into play conventional product liability standards in an area of technology that by necessity is plagued with high risks, inhibit cooperation between the government and private enterprise and inequitably impose liability on an otherwise innocent manufacturer. This the Court will not do.

While it is true that the Fourth Circuit adopted the *McKay* elements for government contract defense, it did so in the same context as *McKay*, i.e., where a serviceman brought suit against a military contractor. In doing so, the Fourth Circuit in *Tozer* stated in unequivocal terms that the "judicial branch is by design the least competent branch to review military matters." *Tozer*, 792 F.2d at 405. This reasoning applies with equal and undistinguishable force to claims brought by servicemen and civilians alike against military contractors for alleged design defects.

Plaintiffs do not cite, nor could this Court find, a single case in which a court has declined to apply the government contract defense solely on the basis of the civilian status of a plaintiff. To the contrary, courts that have considered the issue have adopted and applied the *McKay* rationale en route to barring claims brought by civilian plaintiffs. *See e.g., Boruski*, 803 F.2d 1421; *In Re Air Crash at Mannheim*, 769 F.2d 115; *Burgess*, 772 F.2d 844.

---

**14.** The Court remanded the case to the district court to determine whether the United States set or approved reasonably detailed specifications for the ejection system.

In *In Re Air Crash at Mannheim,* the court relied on the *McKay* policy justifications for the government contract defense and barred the wrongful death claims of *civilian* plaintiffs as well as servicemen [15] resulting from a military helicopter crash. Similarly, the Eleventh Circuit in *Burgess,* cited *McKay* with approval and barred the claims brought by a civilian verterinarian against the manufacturer of a vaccine under contract with the United States Department of Agriculture. Very recently, in *Boroski,* the Seventh Circuit held that, in light of the history and rationale of the government contract defense, it would be illogical to prohibit its application when civilians are involved. *Boroski,* 803 F.2d at 1430; *see also Casabianca,* 428 N.Y.S.2d 400 (injured civilian barred from suing manufacturer of equipment made in accordance with Army specifications).

▪ Plaintiffs also suggest that there is no governmental immunity in this case in that the United States would not be immune from liability under the discretionary function exception of the FTCA based on the facts of this case. This contention ignores Supreme Court precedent and the great weight of recent authority from the Fourth Circuit as well as other circuits. As previously stated, the discretionary function exception is broadly defined and includes decisions by the United States and its employees establishing plans and specifications, and in any area in which "there is room for policy judgment." *Dalehite,* 346 U.S. at 35–36, 73 S.Ct. at 967–78; *S.A. Empresa,* 104 S.Ct. 2755. The military's decisions that relate to its choice of weapons clearly involve policy determinations covered by the discretionary function exception as defined in *Dalehite* and *S.A. Empresa.*

Plaintiffs cite *Moyer v. Martin Marietta Corp.,* 481 F.2d 585 (5th Cir.1973), as their sole authority for the contention that the government is not immune from suit in this case. In *Moyer,* however, the court was under the mistaken impression that the *Dalehite* holding had been eroded in subsequent opinions. *Id.* at 598. Indeed, the court in *Moyer* acknowledged that "without the gloss of later cases *Dalehite* would preclude recovery [against the government in the case under consideration]." *Id.* In *Moyer,* like the case at bar, the inquiry involved resulted from an allegedly defective ejection seat in a military aircraft. Unbeknownst to the Fifth Circuit in *Moyer,* in 1984 the Supreme Court reaffirmed *Dalehite* and its expansive interpretation of the discretionary function exception. *S.A. Empresa,* 104 S.Ct. 2755. Thus, *Moyer* is not persuasive.

In *S.A. Empresa,* the Supreme Court expressly found that *Dalehite* had not been eroded or overruled by subsequent cases. *Id.* at 2764. The Court justified its broad guidelines for the exercise of the discretionary function exception under the same reasoning used for the justification of the government contract defense. The Court stated that the government should be immune from suit because "Congress wishes to prevent judicial 'second guessing' of legislative and administrative decisions ... through the medium of an action in tort." *Id.* at 2765. Such second guessing is exactly what the government contractor defense is designed to prevent.

In *Baxley,* 767 F.2d 1095, the Fourth Circuit recently acknowledged that the Supreme Court in *S.A. Empresa* "provided broad guidelines for defining the scope of the discretionary function exception." *Id.* at 1096. Specifically, the Court, quoting from *S.A. Empresa* stated "[w]hen an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind." *Id.* at 1097. In *Baxley,* the Court applied the exception and affirmed the dismissal of a suit in which the Federal Aviation Administration had made policy decisions in regulating ultralight aircraft.

---

**15.** While the Third Circuit described the decedents as servicement, the district court found at least some of the plaintiffs were civilians. *In Re Air Crash Disaster at Mannheim,* 586 F.Supp. 711, 717 (E.D.Penn.1984); *see also In Re Air Crash at Mannheim,* 575 F.Supp. 521, 522 (E.D. Penn.1983) (court consolidated servicemen actions with actions brought by 34 European passengers).

The Navy decisions that relate to the design, specifications, testing and approval of its weapons systems involve policy choices. *Sanner v. Ford,* 144 N.J.Super. 1, 364 A.2d 43, 47 (S.Ct.N.J.1976) ("The procurement of military equipment by the Government is made pursuant to its war powers and its inherent right and obligation to maintain an adequate defense posture. In carrying out its responsibilities, the Government must be given wide latitude in its decision making process"). The Supreme Court, the Fourth Circuit and the great majority of courts from other jurisdictions have determined that the design function, when it involves any element of policy, clearly falls within the discretionary function exception. *See Baxley* 767 F.2d at 1097 (The FAA has broad mandate to foster safe commercial air flight by promulgating and enforcing minimum standards for air craft design, construction and performance); *Ford v. American Motors Corp.,* 770 F.2d 465, 467 (5th Cir.1985) ("both the evaluation of actual or suspected hazards, and the decision to proceed in a particular manner in light of those hazards, are protected discretionary acts, not subject to tort claims"); *Spencer v. New Orleans Levee Board,* 737 F.2d 435 (5th Cir. 1984); *Miller v. United States,* 710 F.2d 656 (10th Cir.1983).

The United States is immune from liability for its design activity in this case under the discretionary function exception to the FTCA. Given this immunity, the numerous policy justifications for extending this immunity to military contractors as recognized by the Fourth Circuit as well as other circuits, and the willingness of all courts to extend the government contract defense to bar civilian claims, Ramey's status as a civilian will not prevent the application of the government contract defense to his design defect claims.

C. *The Navy Must Establish or Approve Reasonably Precise Specifications for the Design of the Ejection Seat*

██ Plaintiffs assert that Martin-Baker has not proved that the United States es-

tablished or approved reasonably precise specifications for the SJU–5 seat. Plaintiffs also assert that there are no specific military specifications that describe the manner in which Martin-Baker had to design the trip rod and ballistic sear system on the drogue gun and the TRM. Plaintiffs' position ignores the extensive evidence provided by Martin-Baker and is contrary to established principles of law.

Martin-Baker has provided an extensive and undisputed summary of the Navy's involvement in all phases of the procurement, design, testing and approval of the SJU–5 seat for the F–18. *See* Defendant's Motion for Summary Judgment pp. 21–28 and the depositions, affidavits and documents attached thereto. Through this evidence, Martin-Baker establishes the following undisputed material facts.

The Navy awarded McDonnell a contract for the manufacture of the F–18 aircraft on January 22, 1976. (Charleville Dep. at 15–20). This contract called for the manufacture of a fighter aircraft to be used as a weapons system for the destruction of enemy aircraft. (*Id.* at 13–14.)

In the contract, the Navy required that the F–18 be designed in accordance with a detailed specification denoted SD–565–1 (*Id.* at 15–20.) In order to be awarded the contract, the military manufacturer was required to meet military specifications or take exception to them if they were unable to or did not desire to meet them. The military would then have to approve any exceptions made to their specifications. The contract also provided that the first seven aircraft produced by McDonnell would be used for FSD purposes, such as flight tests, spin tests and other experimental programs (*Id.* at 15–20; *see also* footnote 4 *supra* ).

Once McDonnell was awarded the contract for the F–18, Mr. Charleville, McDonnell's Unit Chief in charge of the development of the escape system [16] used in F–18 aircraft, became involved in the selection of

---

16. The escape system in a fighter aircraft in- cludes the ejection seat, the canopy for the air-

an ejection seat for the F–18. (*Id.* at 21–22). The Martin-Baker SJU–5 ejection seat was chosen by McDonnell with the approval of the Navy. (*Id.* at 21–22). The Navy had a representative from Naval Air Systems Command ("NAVAIR") in Washington, D.C. who had responsibility to monitor the development of the escape system. (*Id.* at 22–23). NAVAIR evaluated and approved the original design of the ejectment seat and all changes that occurred during the developmental stages. (*Id.*) In SD–565–1, the specifications for the manufacture of the F–18, the Navy stated that the design of the ejection seat shall be in accordance with Navy military specifications 18471 (Defendant's Exh. 13 at 99). Military specification 18471 was prepared by specialists in ejection seats from Airborne Equipment Group of NAVAIR. (Charleville Dep. at 37–39; Defendant's Exh. 14, military specification 18471).

McDonnell prepared the procurement specifications for the design of the SJU seat for use in the F–18 in conformance with military specification 18471. (Charleville Dep. at 46; Defendant's Exh. 15, procurement specification 74–800200 for seat system). The Navy reviewed the procurement specification 74–800200 and made changes to it. (Charleville Dep. at 28–30; Defendant's Exh. 16, the September 15, 1976, review of procurement specification by NAVAIR). Martin-Baker developed the SJU–5 ejection seat in response to the procurement specification 74–800200.

Pursuant to page 43 of the procurement specification, Martin-Baker was required to develop the structural connections for the ejection seat to the aircraft bulkhead so that there is "an accessible, visible, manual means for easily connecting [and] disconnecting the seat aircraft connections to enable field maintenance personnel to readily install or remove the seat in the aircraft." (Charleville Dep. at 47–50; Defendant's Exh. 15 at 43). In other words, part of the unique design of the F–18 was for it to have an ejection seat that was easily and quickly removable thereby improving the

maintainability of the aircraft. The components involved in this portion of the procurement specification include the trip rods that connect the TRM and drogue guns to the bulkhead of the aircraft. The Navy representatives tested, observed and approved the routing of the connecting devices between the ejection seat and the aircraft hull before the first delivery of an FSD aircraft by McDonnell (Charleville Dep. at 50–53).

From May to August of 1978, the Navy tested the SJU–5 ejection seat and under the dictates of military specification 18471, the Navy required McDonnell and Martin-Baker to prepare and install a mock-up of the crew station to be used in the F–18, that "depicted accurately the location and/or routing of all ballistic devices and signal transmission lines, electrical wiring and seat/component connections and escape system control linkages/components to the aircraft." (Defendant's Exh. 14 at 53). The escape system mock-up that was displayed to the Navy contained the TRM, drogue gun and trip rod connections to the aircraft that plaintiffs claim are defective. Before delivery of the first FSD aircraft, the Navy performed extensive tests on the SJU–5 ejection seat at Navy test facilities. These tests are well documented by the defendant.

The Navy discovered that salt spray, sand and dust could get into the firing sear mechanism at the connections between the trip rods and the TRM and drogue gun. (Charleville Dep. at 61–62). As a result of this discovery, the Navy, McDonnell and Martin-Baker modified the design of the trip rod to improve the environmental sealing and serviceability of this component. However, the Navy approved the FSD aircraft, with the unmodified trip rod design, for use in the FSD program. (*Id.* at 62–63, 147–48; Burrell Affidavit at ¶ 8). NAVAIR representatives inspected and accepted the FSD aircraft, with its unmodified trip rod design, on August 21, 1978, the date on which the first FSD aircraft was

---

craft cockpit and the sequences system that coordinates the canopy jettison and crewman's

ejection (Clarkeville Dep. at 8.)

delivered. (*Id.*) That same day the Navy approved the use of the FSD aircraft for FSD purposes. (Charleville Dep. at 64–65).

This history demonstrates that the military specifications do, in fact, establish design requirements for the components at issue, that the Navy was continuously involved in the development of the SJU–5 seat, and that the Navy approved the design of the components now criticized by the plaintiffs.

The Fourth Circuit has discussed the requirement for the government contract defense that the United States approve reasonably precise specifications for the product at issue. In *Boyle*, 792 F.2d 413, the Court stated that the requirement was satisfied when a defendant manufacturer and the Navy worked together to prepare detailed specifications for the aircraft, there were "back-and-forth" discussions between the manufacturer and the Navy during the development of the design, and when the Navy had an opportunity to review a mock-up of the aircraft and approve the design. *Id.* at 414; *see also, Tozer*, 792 F.2d at 407 ("The contractor's participation in the design—or even its origination of specifications—does not constitute a waiver of the government contract defense."); *Tillet*, 756 F.2d at 599 (defendant proved this element of the defense solely on the basis of the government's approval of the design of the product prototype); *In Re Air Crash at Mannheim*, 769 F.2d at 123 (Army inspection and modification of the prototype aircraft alone was sufficient to satisfy the level of governmental participation in design so as to constitute "approval" as defined in *Koustsoubos*); *Koutsoubos*, 755 F.2d at 355 (governmental approval of specifications developed through a continuous series of negotiations between the contractor and the military satisfies the second

prong of the government contract defense even though the majority of specifications originated with the contractor).

■ Plaintiffs' argument that the Navy's military specifications were not so detailed as to set forth design criteria for the TRM and drogue gun sears is irrelevant in view of the undisputed facts demonstrating the Navy's approval of the design specifications for these components. Approval by the Navy is all that is necessary by the very terms of the defense. Furthermore, the precision of the specifications is well established by Martin-Baker and meets the standard set forth by the Fourth Circuit as well as other courts. *Dowd*, 792 F.2d at 412 (governmental approval of equipment specifications, not design or dictation of them, is all that is necessary.[17]

### D. *Martin-Baker's Obligation to Warn the Navy About Dangers Involved in the Use of the SJU–5 Seat That Were Known to Martin-Baker But Not to the Navy*

■ The fourth element of the government contractor defense is that the manufacturer must demonstrate that it warned the United States about patent error[18] in the government specifications or about dangers involved in the use of the equipment that were known to the manufacturer but not the United States. *Tozer*, 792 F.2d at 414; *McKay*, 704 F.2d at 451; *Agent Orange II*, 534 F.Supp. at 1055; Note, 23 B.C.L.Rev. at 1074–85.

The second part of the fourth element, involving the duty to warn about dangers involved in the use of the equipment, originated in *Agent Orange, II*, 534 F.Supp. at 1054–55. It is based on public policy which requires that, when the military makes decisions concerning whether to use a particular product that may create risks to third

---

17. Plaintiffs' bald suggestion that "if specifications published or approved by the Navy are found not to be 'reasonably precise', then the fact that Martin-Baker may have complied therewith is of no consequence" is without merit in light of the fact that plaintiffs have not provided any facts to support a lack of precision concerning the specifications and in view of the undisputed facts supplied by Martin-Baker, through the deposition of Mr. Charleville, who

is knowledgeable about the entire design history of the ejection seat, that military and procurement specifications, as approved by the Navy, are reasonably precise. (Charleville Dept. at 65–66; *accord*, Burrell Affidavit at ¶ 18).

18. There is no allegation of patent error in the specifications.

parties, it should do so on the basis of "readily available information." *See also, McKay*, 704 F.2d at 451 (duty to warn is necessary to enable the U.S. to balance the risks and benefits inherent in the use of the equipment). "A supplier should not be insulated from liability for damages that would never have occurred if the military had been apprised of hazards known to the supplier." *Agent Orange II*, 534 F.Supp. at 1055. However, if the knowledge level of the supplier and the military is at least in balance, the supplier is protected from liability if it has supplied a product in conformance with reasonably precise government specifications. *Id.*

The plaintiffs assert that Martin-Baker failed to warn the Navy directly about dangers involved in carrying out maintenance work on a fully armed ejection seat. While plaintiffs do not dispute that Martin-Baker issued adequate and complete instructions and warnings to McDonnell on safe maintenance procedure associated with seat removal [19] plaintiffs believe that Martin-Baker failed to apprise the Navy that McDon-

---

**19.** The uncontroverted evidence in the affidavit of Dennis J. Burrell, the Managing Director of Martin-Baker is that the manner in which Martin-Baker communicated with the Navy during the development of the SJU–5 seat for the F–18 was through McDonnell, general contractor for the project. (Burrell Affidavit at ¶ 13). In conjunction with the sale of the SJU–5 seat, Martin Baker provided to McDonnell recommendations for seat maintenance procedures. As a subcontractor, Martin-Baker did not prepare the maintenance manuals that were actually used for FSD or product aircraft. *Id.* McDonnell, under the terms of its contract with the Navy, evaluated Martin-Baker's submissions and prepared its own maintenance procedures for use in the FSD program and for submission to the Navy for use in Navy maintenance manuals. (*Id.;* Charleville Dep. at 76.) In its preparation of McDonnell QPIS documents, McDonnell was free to follow, ignore or revise Martin-Baker's recommendations. Mr. Charleville testified that McDonnell had the exclusive right and responsibility to provide maintenance manuals to Ramey and other FSD mechanics at Patuxent River. (Charleville Dep. at 100–01).

In its maintenance procedures submitted to McDonnell, Martin-Baker issued clear warnings that (1) only skilled mechanics should perform maintenance work on the ejection seat, (2) the ballistic cartridges in the TRM and drogue gun should be removed prior to seat removal from the aircraft, and (3) the installation of safety pins in all potentially dangerous locations on the ejection seat should be installed prior to performance of maintenance work on the ejection seat. (Burrell Affidavit at ¶ 14; Defendant's Exh. 9, Martin-Baker's Technical Manual.) If either instruction 2 or 3 had been included in the McDonnell QPIS documents followed by Ramey, the accident probably would not have occurred. (Burrell Affidavit at ¶ 18). This point is not contested by the plaintiffs. McDonnell, however, elected not to include the Martin-Baker instructions and warnings in the McDonnell maintenance instructions. Moreover, in this instance, Martin-Baker did not know until after the Ramey accident that at Patuxent River McDonnell was using unskilled technicians in the removal of ejection seats, had issued ambig-

uous QPIS on the use of safety pins during seat maintenance, and had instructed the Patuxent River maintenance crews through the QPIS to remove the ejection seats with the drogue gun and time release ballistic cartridges in place. Burrell, Martin-Baker's managing director, has stated:

Martin-Baker did not see the McDonnell quality planning instruction sheets prepared by McDonnell for use by maintenance crews at Patuxent River for the removal of ejection seats until these documents were produced in conjunction with this litigation. McDonnell did not consult Martin-Baker in the preparation of these quality planning instruction sheets, and it was only after the Ramey accident that Martin-Baker learned that McDonnell had issued ambiguous instructions on the use and removal of safety pins in the seat removal process. Likewise, it was only after the Ramey accident that Martin-Baker learned that McDonnell had not recommended in its quality planning instruction sheets to remove the ballistic charges from the drogue gun and time release mechanism prior to seat removal. To the extent that the McDonnell training and supervision procedures and quality planning instruction sheets presented a hazardous situation in seat maintenance procedures at Patuxent River, Martin-Baker had no way to warn the Navy about the inadequacy of McDonnell's procedures, as Martin-Baker simply did not know of the procedures used by McDonnell at the time when Ramey was injured.

(Second Burrell Affidavit at ¶ 5.) These facts are undisputed.

As plaintiffs concede, there are situations where warnings to an intermediary have been deemed sufficient warning to a third person. This Court has not been directed to, nor found, any case in the government contract setting on this point. Because the Court is of the opinion that a more direct and well established reason exists for holding that Martin-Baker has satisfied the fourth element of the defense, set forth in the text above, the Court refrains from making any decision concerning the legal implications of Martin-Baker's warnings made only to McDonnell.

nell was not heeding Martin-Baker's recommendations. In support of this contention, plaintiffs rely on two letters. The first is from McDonnell to Martin-Baker in February 1978 in which McDonnell requested that the procedure to remove the ballistic charges prior to seat removal be changed so that the ballistic charges would not be removed until after the seat was out of the aircraft. (Defendant's Exh. 7). Martin-Baker responded to this letter in March 1978 and stated that it did not agree with the change suggested by McDonnell; that the introduction of this change was contrary to long-standing maintenance procedure; and, that Martin-Baker's procedure calling for the ballistic cartridges to be removed before seat removal should remain unchanged. (Defendant's Exh. 8). The Court does not agree that these two letters raise an inference that Martin-Baker knew or even should have known that McDonnell would not listen to the recommendation of Martin-Baker from whom it was seeking advice. Moreover, the uncontested evidence demonstrates that Martin-Baker did not know until after the Ramey accident that McDonnell had instructed the Patuxent River maintenance crews, through QPIS, to remove the ejection seats with the drogue gun and time release ballistic cartridges in place. (Second Burrell Affidavit at ¶ 5; see note 19 *supra.*)

More importantly, even if Martin-Baker had knowledge of the McDonnell procedures at Patuxent River, the plaintiffs have pointed to nothing in the record that indicates there were any hazards of which Martin-Baker was aware and the Navy was not. Indeed, the Navy, through its own investigation conducted before the Ramey accident, had identified the shortcomings in the McDonnell maintenance procedures. In August 1981, the Commander of the Pacific Naval Air Operations sent a telex to other Naval authorities in which the ejection seat maintenance for the SJU-5 seat was discussed. (Defendant's Exh. 18). In this telex, the Commander of the Pacific Naval Air Operations stated that there were:

3. Deficiencies in technical manuals, procedures ... concerning the SJU-5/A

... ejection seat, installed in the F/A-18 ... identified as follows:

(a) F/A-18 [maintenance manual] ... has several discrepancies which have been documented via technical publication deficiency reports. Of particular concern is the maintenance concept governing the removal/installation of the ejection seat with an armed drogue gun. Present procedures call for the removal of a fully armed seat from the aircraft. It is then transported to the work center where the drogue gun and other portions of the seat are dearmed.

(b) This potentially hazardous situation has been addressed to NAVAIR and NAVSAFECEN [the Naval Safety Center] by the fleet introduction team with recommendations to dearm SJU-5/A ejection seat drogue gun in aircraft prior to removal and rearm seat after installation.

(Defendant's Exh. 18 at ¶ 3.)

Later that month, the Naval Safety Center in Norfolk, Virginia, reported to NAVAIR that "the present concept for F/A-18 escape system maintenance is to remove the seat in an armed condition with safing relying on safety pins. Hazard is drogue gun actuation by firing of the drogue gun or TRM, which are both trip rod (mechanically) fired. Liaison with cognizant fleet ... and tech rep personnel indicate concurrence that this concept is undesirable as it represents an inherent unsafe condition." (Defendant's Exh. 19 at ¶ 2(c)). This communication went on to state that the "technical material deficiencies noted above have been widely recognized as impediments to safe and effective performance of escape system maintenance...." (*Id.* at ¶ 3).

Finally, on September 10, 1981, more than one month before the Ramey accident, the Commander of the Pacific Naval Air Operations informed the Naval Safety Center, NAVAIR and the Commander of the Atlantic Naval Air Operations that the McDonnell maintenance procedures "governing the removal/installation of the ejection seat with an armed drogue gun ... call for the removal of a fully armed seat

from the aircraft which is then transported to the work center where the drogue gun and other portions of the seat are dearmed." (Defendant's Exh. 20 ¶ 2). This telex report goes on to "recommend termination of present F/A–18 ejection seat maintenance procedures and immediate action to initiate safe seat maintenance procedures." (*Id.* at ¶ 3).

With the relative knowledge of the Navy and Martin-Baker being equal, as demonstrated by Martin-Baker, and plaintiffs' failure to place these material facts in dispute, the fourth element of the government contract defense has been satisfied. *Boyle,* 792 F.2d at 415; *Bynum,* 770 F.2d at 577. Martin-Baker had no obligation to warn the Navy of the potential safety hazards at issue. *See, e.g., Tillett,* 756 F.2d at 599.

### E. *Summary*

Plaintiffs' product liability claims relating to their assertion that the design of the trip rod, firing lever and sear components of the ejection seat were defective are barred by the government contract defense. Given the United States' immunity from liability under the discretionary function exception to the FTCA, Ramey's civilian status does not preclude application of defense. The uncontroverted evidence establishes that the Navy approved reasonably precise specifications for these components and Martin-Baker's ejection seat met these specifications because the Navy accepted the seat for FSD purposes. The record also establishes that the Navy knew of the dangers involved in the maintenance of the ejection seat well in advance of the accident at issue.[20] Therefore, this Court must find that Martin-Baker is entitled to partial summary judgment as a matter of law with respect to plaintiffs' design defect claims.

### III.

The gravamen of plaintiffs' other claim is that Martin-Baker breached its duty to warn Ramey of the potential dangers involved in maintaining the ejection seat by not providing warnings or directions on the seat itself or in a maintenance manual. Plaintiffs premise their assertion of this duty on § 389 of the Restatement (Second) of Torts which requires that the supplier of a chattel inform not only the person to whom the chattel is supplied, but also those persons expected to use the chattel, of the dangerous character of the chattel, if the supplier knows or has reason to know that the chattel is unlikely to be made reasonably safe before being put to use.[21]

Neither party addresses the issue of whether or not a duty to warn claim may be barred by the government contract defense. Martin-Baker appears to assume either that a breach of a duty to warn is a type of design defect and thus explicitly covered by the defense or that the defense applies to product liability claims in general, which includes a duty to warn claim. Plaintiffs, on the other hand, make no effort to distinguish their breach of duty to warn claim from their design defect claims in opposing the application of the government contract defense and, apparently following the lead of Martin-Baker, believe the defense can bar either type of claim.

---

**20.** Neither party has made an issue of when the Navy knew or had to know about the potential dangers involved in the maintenance of the ejection seat.

**21.** Section 389 of the Restatement provides:
§ 389. Chattel Unlikely to be Made Safe for Use
One who supplies directly or through a third person a chattel for another's use, knowing or having reason to know that the chattel is unlikely to be made reasonably safe before being put to use which the supplier should expect it to be put, is subject to liability for physical harm caused by such use to those whom the supplier should expect to use the chattel or to be endangered by its probable use, and who are ignorant of the dangerous character of the chattel or whose knowledge thereof does not make them contributorily negligent, although the supplier has informed the other for whose use the chattel is supplied of its dangerous character.
The Court makes no determination, at this time, as to whether Maryland has adopted or would apply § 389 so as to hold a manufacturer liable for a failure to warn. *See Vann v. Willie,* 284 Md. 182, 395 A.2d 492 (1978).

The Court is not convinced of this and deems it necessary to address this issue.

Product liability suits generally involve claims based on one or more of the following theories: the product was defectively manufactured; the product was defectively designed; or the product had inadequate warnings concerning its dangers. To reiterate, the government contract defense as adopted by the Fourth Circuit, specifically states that it protects government contractors from liability in product liability suits based on design defects. *Tozer*, 792 F.2d at 408.

█ It is also well established that, where mistakes are made in the manufacturing process of a product, i.e., the manufacturer does not comply with the design specifications, the manufacturer is not shielded from liability. There the causal connection between the injury and the defect is attributable to the manufacturer and the government contract defense does not apply. *McKay*, 704 F.2d at 448 n. 6; *Foster v. Day & Zimmermann, Inc.*, 502 F.2d 867 (8th Cir.1974); *Whitaker v. Harvell-Kilgore Corp.*, 418 F.2d 1010 (5th Cir. 1969); *Montgomery v. Goodyear Tire & Rubber Co.*, 231 F.Supp. 447 (S.D.N.Y. 1964).

The question remains open as to whether the defense will bar claims concerning the duty to warn. It seems that the answer can be "yes" or "no" depending on how the claim is asserted and the analysis used. For example, in *Koutsoubos* 553 F.Supp. 340, the plaintiff alleged, in addition to design defects, manufacturing defects and a failure to warn the decedent of hazards associated with the product at issue. Upon closer examination of the evidence in the case, the court found that these additional allegations were merely repetitive of plaintiff's assertions concerning design defects. The court based this decision on plaintiff's answer to interrogatories which stated that the aircraft "had not been properly designed, manufactured, assembled and tested." Thus, the court barred plaintiff's duty to warn claims, applying the government contract defense. *Id.* at 344.

Here it is unclear exactly how the plaintiffs are framing their breach of duty to warn claim. In their complaint, the plaintiffs assert that Martin-Baker was under a duty to provide instructions and warnings to protect against inadvertent discharging of the seat during routine maintenance, which plaintiffs assert is a design defect. Phrased this way, the plaintiffs' duty to warn claim is, as was stated in *Koutsoubos* merely repetitive of plaintiffs' defective design claims. The Court has already determined that plaintiffs' claims based on alleged design defects are barred.

However, in plaintiffs' opposition to the motion for summary judgment, they state that Martin-Baker was under a duty to place stickers on the ejection seat and/or provide maintenance instructions warning that the seat should not be removed while the seat is fully armed with the ballistic charges. Although this claim may not be a repetition of the alleged design defect concerning the seat's potential to inadvertently discharge, it too may be viewed as a type of design defect under the theory that warnings in general are safety components of the product, the existence of which are dictated by the design specifications established or approved by the Navy. Under this theory a manufacturer should be given the same protection from liability for defects in verbal safeguards as it is for defects in physical safeguards.

There is no doubt that when the government designs a product or approves a design of a product which calls for some physical safeguards but not others, the government contractor is not held liable for the safeguards not provided for in the specifications. *See, e.g., In Re Agent Orange I*, 506 F.Supp. at 793. "[The question of taking safeguards against harm caused by the plans] was a decision which rested with the Government. The Government did not provide for additional precautions in the plans, and the [contractor] is not to be held liable for this omission." *Id.*, quoting from *Dolphin*, 243 F.Supp. at 827; *see also Tillet*, 756 F.2d at 599; *Sanner*, 144 N.J.Super. 1, 364 A.2d 43 (manufacturer is not under a duty to provide every known safety device particularly where not called for by the

government contract); *cf. Johnston,* 568 F.Supp. at 354 (the contract specification defense may defeat claims of negligent failure to warn). Based on the policy justifications supporting the government contract defense, there is strong support for the view that warnings or the lack thereof are consumed in the design of the product and claims alleging warning defects are barred.

The Court is cognizant of the fact some commentators and courts have considered defective design claims and defective warning claims as two separate theories of recovery in certain cases. *See e.g.* Twerski, A.D. *The Use and Abuse of Warnings in Product Liability—Design Defect Litigation Comes of Age,* 61 Corn.L.Rev. 495 (1976); *McKay,* 704 F.2d 444 (the court separated plaintiff's § 402 claims from § 389 claims and only applied the government contract defense to the former); *Johnston,* 568 F.Supp. at 359 (court separated the design defect claims from the duty to warn claims deeming the latter as not coming under the government contract defense). Even if the plaintiffs' breach of duty to warn claim, in the present case, is to be considered a separate theory of recovery, the plaintiffs have done nothing to support this claim, while Martin-Baker has indirectly put in issue, to some extent, that plaintiff's duty to warn claim, based on § 389, is not supported by the facts of this case.[22]

At the present time, because the parties have failed to adequately address the duty to warn claim, the Court will deny summary judgment on this issue, without prejudice to Martin-Baker's right to renew the motion as to this issue. If it chooses to do so, Martin-Baker should address the following:

(1) whether plaintiffs' duty to warn claim is, in effect, a design defect claim;

(2) whether the government contract defense is applicable to the duty to warn claim: (a) in the event that it is a design defect claim; and (b) in the event that it is not;

(3) whether the plaintiffs' duty to warn claim, in this case, is barred by the government contract defense; and

(4) whether plaintiffs' duty to warn claim fails as a matter of law under § 389 or any other theory.

Martin-Baker is free to address any other issues which it deems relevant. Plaintiffs will be given an opportunity to respond to Martin-Baker's second motion for summary judgment. The Court expects the plaintiffs to make clear their basis for alleging that Martin-Baker owed a duty to warn Ramey and how that duty was breached, as well as respond to the positions asserted by Martin-Baker relating to the issues outlined above. The Court expects all the parties to support their positions with competent evidence and pertinent authority.

A separate Order will be entered confirming the rulings made herein.

### ORDER

In accordance with the foregoing Memorandum, IT IS this 19th day of March, 1987, by the United States District Court for the District of Maryland, ORDERED:

1. That defendant Martin-Baker's motion for summary judgment BE and the same hereby IS, GRANTED, in part and DENIED, in part;

2. That judgment BE, and the same hereby IS, entered in favor of defendant Martin-Baker and against plaintiffs with respect to plaintiff's design defect claims;

3. That the partial denial of summary judgment is without prejudice to defendant Martin-Baker's right to file a second motion for summary judgment on the remaining claim concerning the duty to warn;

---

**22.** For example, but not by way of limitation, Martin-Baker has put in issue whether Martin-Baker had any reason to know that the ejection seat would not be made reasonably safe before being maintained, than an untrained mechanic would work on the seat, that the untrained mechanic would follow instructions that may have been inappropriate for manual disassembly or that the untrained mechanic would disregard the instructions by not securing the trip rods which may have prevented the accident. Martin-Baker may wish to take the opportunity to expand on these and other issues and support them with additional evidence and authority.

4. That if defendant Martin-Baker desires to file a second motion for summary judgment, it should do so within 45 days from the date of this Order, subject to modification by the Court in the event additional discovery is shown to be necessary;

5. That the Clerk of the Court shall mail copies of this Order and foregoing Memorandum to counsel of record in this case.